**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jess A. RODRIGUES, Defendant–**
**Appellant.**

**No. 97–10113.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 1998.

Decided Oct. 28, 1998.

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, CA; David A. Nickerson, San Rafael, CA, for defendant-appellant.

Albert S. Glenn, Stephen L. Schirle, Assistant United States Attorneys, San Francisco, CA, for plaintiff-appellee.

Before: REINHARDT, NOONAN, and THOMPSON, Circuit Judges.

NOONAN, Circuit Judge.

Jess A. Rodrigues appeals his conviction of crimes in connection with his ownership of Saratoga Savings and Loan Association (Saratoga). We set out the background facts and then review his appeal in terms of the various counts with which he was charged and of which he was convicted; we end with an overview of the government's conduct of the case.

## BACKGROUND

In 1964 Rodrigues formed a mortgage banking company, California Housing Securities Inc. (Cal Housing). Rodrigues was the sole owner. In 1982 Cal Housing purchased the charter of a savings and loan company, Saratoga, which became Cal Housing's wholly owned subsidiary. Rodrigues invested $2 million in Saratoga. In 1983 Saratoga became a member of the Federal Home Loan Bank and opened for operations. All of Rodrigues's troubles began with his entry into this federally insured business.

In 1984 Cal Housing proposed to transfer its mortgage lending business to Saratoga in exchange for a payment of $4.5 million. From 1984 through November 1989 Saratoga carried Cal Housing's business on its books as if it were its own, although on April 9, 1986 the State Department of Savings and Loan denied the request of Saratoga to take on the business. In the period of Saratoga's operation of the mortgage loan business there were losses leading to tax refunds that have become one center of controversy in this case.

In November 1989 the Resolution Trust Corporation (the RTC) seized Saratoga and placed it under a conservatorship. The Federal Home Loan Bank initiated proceedings against Rodrigues before Administrative Law Judge Paul Cross. On December 5, 1989 the Office of Thrift Supervision issued an order banning Rodrigues from participation in the affairs of Saratoga or Cal Housing.

On May 24, 1990 the RTC was made receiver of Saratoga. Its property was liquidated, and its remaining assets transferred to a new, federally chartered savings and loan called Saratoga Savings and Loan Association (New Saratoga).

In April 1992 Cal Housing received from the United States Treasury over $3.4 million representing the refund of taxes chiefly paid by Saratoga for the tax years ending in 1984 and 1985. Rodrigues used a portion of this amount for his own benefit.

On March 30, 1994 Rodrigues was indicted on 47 counts. Nineteen counts were eventually tried to a jury. Counts One through Fourteen related to four real estate deals in which Rodrigues had engaged and which Saratoga had aided. Counts Fifteen through Nineteen focused on the tax refunds. Trial began February 6, 1996. Rodrigues was found guilty on all counts. He appeals. We consider his arguments in turn.

*The Real Estate Deals.* Counts One through Four charged Rodrigues with the violation of 18 U.S.C. § 215 in connection with the four real estate transactions. In the relevant time period, 1984–1989, there were three versions of this statute. Prior to October 12, 1984 it did not apply to directors of federally insured institutions such as Saratoga and consequently had no application to Rodrigues. As of October 12, 1984, it was amended to read in relevant part as follows:

§ 215. Receipt of commissions or gifts for procuring loans

(a) Whoever, being an officer, director, employee, agent, or attorney of any financial institution, bank holding company, or

savings and loan holding company, except as provided by law, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value, for himself or for any other person or entity, other than such financial institution, from any person or entity for or in connection with any transaction or business of such financial institution ... shall be fined ... or imprisoned...."

Act of Oct. 12, 1984, Pub.L. No. 98–473, 98 Stat. 1837, 2145–46 (1984).

On August 4, 1986, Section 215 was amended to read as follows:

§ 215. Receipt of commissions or gifts for procuring loans

(a) Whoever ...

(2) as an officer, director, employee, agent or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution ... shall be fined ... or imprisoned....

18 U.S.C.A. § 215 (West 1998).

It is apparent from the indictment that it is the 1986 version of the statute that Rodrigues as a director of Saratoga is charged with violating in the four deals that the indictment labels "The Kickback Transactions." Each count charges that Rodrigues accepted money intending to be rewarded and influenced "in connection with the business of Saratoga Savings." At the end of the trial the government proposed jury instructions that stated that the government must prove that the defendant "corruptly accepted or agreed to accept something of value from another person," specifically from his partners in the real estate ventures, and that he "accepted the interest in the real estate venture and the funds realized therefrom intending to be rewarded in connection with some business or transaction of Saratoga Savings."

■ In the first of the real estate deals, the purchase of property on Lick Avenue, San Jose, Rodrigues on January 18, 1984 signed a letter committing Saratoga to participate in a joint venture with Ron Tate and David Lazares to buy the property. A few days later Rodrigues substituted himself for Saratoga as a one-third participant. On May 29, 1984 Home Federal agreed to finance the entire deal with a loan of $3.8 million. Escrow closed on September 12, 1984. During none of this period did Section 215 apply to Rodrigues.

The Lick Avenue property was sold in May 1988, and Rodrigues received one-third of the profit. As he had acquired a one-third interest in the property in 1984, his share was unexceptionable. The profit in 1988 was the fruit of property lawfully acquired before October 12, 1984. Conviction on Count One must be reversed.

■ The second deal was for the purchase for $500,000 of four acres of undeveloped land in Marina, Monterey County, California. As of March 27, 1984 Rodrigues agreed to provide the cash for the project, again coventuring with Tate and Lazares. In November of 1984 Saratoga agreed to fund the closing by a loan of $456,000 to Tate and Lazares. Section 215 applied. On the evidence presented the jury could rationally infer that Saratoga provided the loan at Rodrigues's request and that in exchange for arranging the loan Rodrigues received a one-third interest in the project. There was a violation of Section 215.

■ In late June 1985 Tate and Lazares needed financing of $1.6 million to buy warehouse property at the former Continental Can Company site in San Jose. Rodrigues told them that they could each draw $800,000 on their personal lines of credit at Saratoga. According to Tate, Rodrigues also said that Saratoga would take a fee of $200,000 for making the funds available. Escrow closed on July 2, 1985. A few days later, according to Tate, Rodrigues told him that instead of a fee to Saratoga he would take a one-third interest in the property. In April 1986 the property was sold at a profit, of which Rodrigues took one-third.

At trial Rodrigues sharply challenged Tate's credibility, contending that it was improbable that Saratoga could have charged so much (61% if annualized) for a commitment of a few days. The jury believed Tate,

and we are not in a position to second-guess the jury. On the basis of Tate's testimony we must conclude that Rodrigues took a pay-off from Tate and Lazares for arranging the financing from Saratoga. Although, in January 1986, he did put additional funds of his own into the project, his one-third interest was given, at his request, in return for Saratoga's financing. He violated Section 215 both by asking for and by receiving this interest. He was properly indicted and properly convicted.

■ In February 1984, Rodrigues agreed with Richard Christina and Murray Hall to be a one-third partner in the purchase of the Cinnabar Building, a large warehouse in San Jose. Each partner put up $150,000, and, in addition, Rodrigues obtained a loan of $1 million from Crocker Bank. On March 26, 1984 Christina and Hall obtained $400,000 in a personal line of credit from Saratoga; $300,000 of this amount was used to close the Cinnabar transaction on March 28, 1984. The property was refinanced in 1987 and sold later in the year for a profit. Section 215 did not apply to Rodrigues before October 12, 1984, so what he received before this date was not forbidden by the statute. The government did not prove that his profit in 1987 was a reward for arranging for Christina and Hall's line of credit, rather than a return on his large personal investment in the project. Conviction on Count Four must be set aside.

Counts Five through Eight focussed on the same real estate deals as Counts One through Four, this time charging Rodrigues with participation in them with the intent to defraud Saratoga, the United States, and agencies of the United States. The statute invoked was 18 U.S.C. § 1006. The relevant part of the statute, as indicated by the jury instructions, makes it a crime for anyone connected in any capacity with a federally insured savings and loan to share in or receive, "directly or indirectly," any profit or benefit through "any transaction" or other act of the savings and loan, if he does so with intent to defraud the United States, its agencies, or the savings and loan. The intent to defraud was defined by the jury instructions as "an intent to deceive or cheat."

■ As to the Lick Avenue transaction as charged under Count Five, Rodrigues issued a commitment on behalf of Saratoga and then substituted himself. According to Tate's testimony, he received a one-third interest in exchange. Saratoga's commitment letter, which was a thing of value, resulted in no benefit to Saratoga; it did to Rodrigues. There was a fraud on Saratoga. The intent to defraud is established by Rodrigues's willingness to use Saratoga's assets to benefit himself.

■ As to the Marina transaction, Rodrigues played a key role in securing Saratoga's loan to Tate and Lazares to close the deal. The loan benefitted Rodrigues. Saratoga obtained nothing beyond a normal interest return for the initial loan. The jury was not unreasonable in finding Rodrigues guilty on Count Six of defrauding Saratoga. The same analysis applies, even more clearly, to the Continental Can transaction where Rodrigues explicitly took a personal share in the property in lieu of a fee to Saratoga. In the same way Rodrigues was properly found guilty of obtaining credit from Saratoga for Christina and Hall to close the Cinnabar purchase with no extra fee going to Saratoga. Rodrigues was, therefore, properly convicted of Counts Five, Six, Seven and Eight.

Counts Nine through Twelve took up the four real estate deals under another provision of 18 U.S.C. § 1006, this one making it criminal for one in Rodrigues's position to make a false entry in any book, report or statement to the savings and loan with the intent to deceive any officer of the institution or any agency of the United States. The evidence is that as to all four transactions Saratoga was required by the examiners to list each enterprise in which any of its personnel had a direct or indirect interest. Saratoga did not disclose Rodrigues's partnership interests because Rodrigues failed to provide the information. According to the jury instruction, the government had to show that the false entry was material, that it was capable of influencing Saratoga or the examiners, and that Rodrigues acted with the intent of defrauding Saratoga or the examiners. All four deals where Rodrigues gained

from Saratoga's credit were concealed by him with the intent to deceive the examiners.

On appeal Rodrigues argues that as Counts One through Twelve each alleged numerous acts, he was entitled to an instruction requiring the jury to be unanimous as to each act under each count that they found criminal. Rodrigues did not ask for such an instruction. When the defendant wanted unanimity on a specific item, he knew how to ask for it, as he did on Counts 13 and 14. His silence at trial as to Counts 1 through 12 strongly suggests a deliberate choice and intelligent waiver. *See United States v. Perez,* 116 F.3d 840, 845 (9th Cir.1997). Even if we accede to the defendant's theory on appeal that there was plain error, the appeal is unavailing. In each of the counts where we have upheld Rodrigues's conviction, there was no substantial dispute that he received a benefit, that Saratoga lost a benefit, and that Rodrigues failed to disclose his interest. The possibility of jury confusion was slight. There was no miscarriage of justice in the convictions. There is no reason to find plain error. *United States v. Keys,* 133 F.3d 1282, 1286 (9th Cir.1998) (en banc).

Count Thirteen charged Rodrigues with supplying false information as to his part in the Continental Can purchase when in the spring of 1987 the examiners specifically inquired about it because they saw "the appearance of a serious conflict of interest." Three false statements by Rodrigues were alleged, and the jury was instructed that it must agree unanimously as to which were false and that the statements were made to influence the examiners. The evidence supported Rodrigues's conviction.

Count Fourteen took up three similar denials of interest by Rodrigues in the course of his testimony before ALJ Cross. Again the jury was told to be unanimous as to the statement or statements it found to be criminal. No doubt is raised that the lies were uttered by Rodrigues and were intended to influence the government.

*Violations of the Banning Order.* On December 5, 1989 Rodrigues was the subject of an order of the Office of Thrift Supervision removing him from any position in Saratoga and prohibiting him "from participating in any manner in the conduct of the affairs of Saratoga and any and all subsidiaries or holding companies affiliated with such savings association, including (but not limited to) California Housing Securities Inc. (CHS), the holding company of Saratoga."

The order carried with it a criminal sanction under 12 U.S.C. § 1818(j), which provides that whoever, subject to such an order, "knowingly participates, directly or indirectly, in any manner ... in the conduct of the affairs of ... any insured depository institution [or] ... the Resolution Trust Corporation shall be fined not more than $1,000,000, imprisoned for not more than five years or both." 12 U.S.C.A. § 1818(j) (West 1998).

Count 15 of the indictment charged that on May 5, 1992 Rodrigues, being subject to such an order, "knowingly participated in the conduct of the business affairs of Saratoga Savings and Cal Housing." In particular, the indictment charged that on April 28, 1992 Cal Housing received tax refunds which "were forwarded to Cal Housing with the expectation Cal Housing would allocate the Refunds between itself and Saratoga Savings, and would forward the appropriate portion to Saratoga Savings"; and that, instead, in violation of the banning order, Rodrigues caused these funds in the amount of $525,000 to be withdrawn to pay off his personal indebtedness.

The indictment failed to charge a crime. Cal Housing was not an insured depository institution. Saratoga, which was such an institution, ceased to exist in 1990. Its property was then liquidated and its assets assumed by New Saratoga. 12 U.S.C. § 1818(q) states that "[w]henever the liabilities of an insured depository ... have been assumed by another insured depository ... the insured status of the depository institution whose liabilities are so assumed shall terminate on the date of receipt by [the Federal Deposit Insurance Corporation] of satisfactory evidence of such assumption" and "the separate insurance of all deposits so assumed shall terminate at the end of six months from the date such assumption takes effect." By virtue of the statute neither

Saratoga nor its deposits were insured in 1992.

The government relies on the district court's ruling on Rodrigues's motion to dismiss: "Although Saratoga no longer received or even held deposits, it still was an insured depository in the sense that it had insurance protecting its former account holders. More importantly the accounts identified with factual specificity the conduct defendant alleged to have constituted the crime." The issue, however, is not whether Saratoga in some sense was insured but whether it was insured within the terms of 12 U.S.C. § 1818(q). Very clearly it was not. The specificity of the accounts identified could not make criminal any conduct falling outside § 1818(q).

■ The government also argues that § 1818 makes it a crime to knowingly participate in the affairs of the RTC in any manner including engaging in an activity specifically prohibited by the banning order. The difficulty with this response is that the indictment does not charge that Rodrigues participated in the affairs of the RTC. Indictments must give fair notice of the crime they charge. At no point in the nine paragraphs spelling out the crimes here charged is there mention of the RTC. The indictment was inadequate to charge violation of the criminal statute enforcing the banning order.

■ *Rodrigues's Withdrawals From Cal Housing.* The indictment in Count 16 builds on facts alleged in Count 15 as to the tax refunds paid Cal Housing "with the expectation Cal Housing would allocate the refunds between itself and Saratoga Savings." Whose expectation it was is not specified. Count 16 charges that Rodrigues on April 30, 1992 withdrew $459,661.48 from the Cal Housing account containing the tax refunds and did so to pay off a loan on his personal residence. The indictment continues: "In order to persuade and trick members of Cal Housing's board of directors to ratify his disbursement of the Saratoga refunds Jess Rodrigues concealed material information from them." The crime charged is a violation of 18 U.S.C. § 1344, which makes it a crime "to defraud a financial institution" or to obtain money from a financial institution "by means of false or fraudulent pretenses."

The indictment charged that the money was "owned by a financial institution."

Cal Housing is not a "financial institution" as defined by 18 U.S.C. § 20. Evidence of a fraud upon it would not have been evidence of a fraud upon a financial institution. New Saratoga is a financial institution as defined by the statute. The instruction on Count 16 specified that the fraud was on New Saratoga and said that the government must prove "a scheme to obtain tax refunds belonging to Saratoga Savings and its successor New Saratoga" and that Rodriguez took a substantial step toward carrying out the scheme by withdrawing the cash from the Cal Housing account holding the refunds.

The instruction dropped the allegation of concealment of material information from Cal Housing's directors. Doing so, the instruction reduced the elements of the crime to the taking of money "belonging" to New Saratoga by a scheme that constituted fraud. The indictment had specified that the allegedly defrauded financial institution owned the money. The instruction must be read in the sense of the indictment: "belonging to" Saratoga means owned by Saratoga.

■ Because the statute is written in the disjunctive, to prove the crime the government did not have to show any false or fraudulent pretenses; it was enough to prove a scheme to defraud. *United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir.1992). The barefaced appropriation for oneself of money one knew to belong to another would constitute the crime. The critical question is whether the refunds belonged to New Saratoga in the sense of the statute. The general instruction given to the jury, "Definition Of Belonging To Institution," stated that "the following rule should be applied. If the entity which sustained the losses also earned the income which was offset by those losses, that entity is entitled to the tax refund.... [I]f each of the entities earned some of the income or suffered some of the losses, an allocation of the tax refund has to be made based upon who earned what income and who incurred what losses." Rodrigues objected to the instruction. On appeal, he argues that

the government did not prove that New Saratoga owned the refunds.

The evidence established that most of the tax losses were Saratoga's and that New Saratoga had a right to almost all of the refunds. The refunds inured to its benefit. *In re Bob Richards Chrysler–Plymouth Corp. Inc.*, 473 F.2d 262, 265 (9th Cir.1973). The evidence did not establish that New Saratoga owned the refunds; rather, it was owed them. The indictment itself speaks of Saratoga as having an "entitlement" to the refunds and of "the right to receive the Saratoga Refunds" as being "assigned" to New Saratoga. An entitlement or right to receive is an interest distinct from ownership. If A takes money from your debtor so your debtor cannot pay what he owes you, A does not defraud you. Taking money from Cal Housing, thereby impeding payment of its obligations to New Saratoga, was not a fraud on New Saratoga. Count 16 was not proved.

■■■■ Count 17 also built on the tax refunds by specifying that on May 26, 1992 Rodrigues drew a check for $100,000 from the refund account at Cal Housing in order to open a personal bank account. The crime charged was violation of 18 U.S.C. § 657 that makes it a crime to embezzle money belonging to a federally insured institution. Assuming that the refunds could ultimately have been obtained by New Saratoga, it cannot be said that in April 1992 they "belonged" to New Saratoga. The federal statute protects depository institutions from having their property stolen or embezzled. The statute incorporates the common law concept of the crime. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *cf. United States v. Faust,* 850 F.2d 575, 579 (9th Cir.1988). Embezzlement requires that the property taken be owned by the victim, not owed to the victim. Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law,* § 8.6(d) (2d ed.1986). A person or an institution who has a claim to money does not own the money. The money does not "belong" to that person or institution. So, here, whatever entitlement New Saratoga might have established to receipt of the refunds, they were not owned by New Saratoga. The government did not produce the slightest evidence to show that New Saratoga was the owner of the property it alleged Rodrigues embezzled.

■■■■ Count 18, again referring to the tax refunds, alleged that on May 19, 1992 Rodrigues drew a check for $100,000 on the Cal Housing account to open a personal account at a securities firm, doing so with intent to steal and purloin money and property belonging to a savings and loan association in violation of 18 U.S.C. § 2113. This statute is entitled "Bank Robbery and Incidental Crimes" and inter alia punishes whoever "steals or purloins ... any property ... belonging to any savings and loan association. . . ." If you are a depositor in a bank, you may say that the amount of the deposit "belongs" to you. But if a robber robs the bank or a thief steals the money in the bank's vaults, the robbery or theft is from the bank, not you. The bank's obligation to you is unaffected. Your property is not purloined. Theft requires ownership of the stolen property by the victim of the theft. No savings and loan association owned the property in question. No facts alleged in the indictment support the count. No facts produced at trial support the charge.

■■■■ Count 19 charged Rodrigues with violation of 18 U.S.C. § 1032 by corruptly impeding the functions of the RTC by paying $50,000 from the refund account to pay a bonus to the accountant who had filed for the refunds. The government's position was that the payment placed this sum beyond the reach of the RTC which had the obligation to collect the assets of New Saratoga. The statute, enacted in 1990, is relatively untested. The RTC had the right to apply for the tax refunds due Saratoga. 26 C.F.R. § 301.6402–7(c) (1998). The RTC did not exercise this right. The RTC complains about a situation it could have prevented from arising.

That the payment was to Cal Housing's accountant did not make it corrupt. If the refund was ultimately owed to New Saratoga, the RTC could recover it in equity from one like the accountant who had knowledge of all the relevant facts. The payment was not hidden. Unless the statute criminalizes the

disposition of any fund to which the RTC has an arguable claim, it is difficult to see what crime was committed here. The conviction on Count 19 cannot be sustained.

In closing argument to the jury Assistant United States Attorney Stephen Schirle described the "second part of the case," Counts 15 through 19, as "a case of stealing." His speech aptly summarizes the government's theory, for which there was no evidence. Stealing does not take place unless property is taken from its lawful owner. Rodrigues moved pre-trial to dismiss the tax refunds counts for failing to charge what belonged to Saratoga. At the conclusion of the prosecution's case, at the close of all the evidence, and following the return of the jury's verdict Rodrigues filed Rule 29 motions. He pointed out: "Saratoga had no legal title or ownership in the refund proceeds. The government seeks to substitute equitable consideration as a basis for ownership. That is legally deficient." Rodrigues's argument was correct.

*Double Jeopardy.* The double jeopardy argument raised by Rodrigues because of earlier civil proceedings against him by the government has been laid to rest by *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).

*The Government's Conduct Of the Case.* In conformity with the indictment and the instructions, Assistant United States Attorney Schirle in his closing told the jury that Rodrigues's interest in the Continental Can property "looks like a gift, but it wasn't a gift. It was his benefit for providing the $1.6 million in one day." In each of the four real estate deals, Schirle argued, Rodrigues got his interest for coming up with a Saratoga loan or commitment. Counts One through Four, Schirle stated, "charge the corrupt receipt of rewards."

In response, Attorney Steven Neal stated the defense theory that, even before Rodrigues owned Saratoga, Tate and Lazares had agreed that he would be a one-third partner in their deals and that he got his one-third interest because he assumed the liability proportionate to this share. The one-third interest was not a payoff for securing financing from Saratoga. The government, Neal told

the jury, had to prove that Rodrigues's interest was "in exchange for" the loan, or "a reward for making the loans that are in issue here," or "a kickback" or "a bribe." Neal stated that his argument applied to the first eight counts, that is Counts One through Four, charging violation of § 215 and Counts Five through Eight charging violation of § 1006.

Assistant United States Attorney Wayne T. Lamprey closed for the government. He stated:

I think, having heard Mr. Neal, you all must be feeling somewhat confused.... Mr. Neal has tried to deceive you from the start in this case about what this case is really about.

. . . . .

Mr. Neal has tried to pretend that this case is about kickbacks and about bribery. Do you know that the only person who has mentioned kickbacks or bribery is Mr. Neal? I've never said either of those words.

That's because Mr. Rodrigues is not charged with soliciting a bribe or taking a kickback.

. . . . .

[Mr. Neal] has tried to introduce a number of nonissues, false issues.

Ladies and Gentlemen, I'm not asking you to take my word for what the charges are. You listen carefully to the instructions that His Honor will give your tomorrow. You listen and see, does he ever use the word bribery? Does he ever tell you we had to prove a kickback? Does he ever tell you we had to prove what these were in exchange for?

Mr. Neal harped on that. "It's the core of the government's case" he said, "the core of its case." That is flat out untrue, and you listen to the judge's instructions and see who is spilling ink in this courtroom.

. . . . .

On the loan transactions, the charges are very straightforward. Under all the statutes, it comes down to two real things

after you set aside. Is he an officer and is it federally insured? Did he get benefits? ... What's the other question? Did he get these benefits with criminal intent?

■ This account of what the government had to prove to convict under § 215 was simply wrong. The government had to prove more than that Rodrigues had received benefits with criminal intent. The instructions stated that to convict on the first four counts the jury must find that Rodrigues "corruptly accepted or agreed to accept something of value." That would appear to be a conventional definition of agreeing to a bribe. "To corrupt" is a standard synonym for "to bribe." *Webster's Third International Dictionary* (1981) at "corrupt." To accept corruptly something of value as a reward is to accept a payoff or bribe. The instructions also said the jury must also find that he accepted the real estate interest "intending to be rewarded." The government seemed to suppose a reward or something paid after the loan was arranged should not be termed a bribe. But the standard definition of "bribe" is "a price, reward, gift or favor bestowed or promised with a view to pervert the judgment or corrupt the conduct." *Id.* at "bribe." "Reward," like "gift" in this context, is a term used to disguise the ugliness of the act of giving or receiving a bribe. A similar term is "kickback," which can mean a rebate or a percentage payment of a gain corruptly secured, *Id.* at "kickback," and is often used colloquially as the simple equivalent of "bribe." *See Noonan on Bribes* (1984) 660. None of these common euphemisms designates a corrupt payoff different from a bribe.

In his argument defense counsel described what the indictment charged, what the government's trial brief had set out, what the instructions covered, what Assistant United States Attorney Schirle had argued. It was the indictment Assistant United States Attorney Lamprey himself had drafted that described the real estate deals as "The Kickback Transactions." The instructions had not eliminated their essential characteristic of exchanges, of payoffs for the obtaining of credit. The jury still had to find that Rodri-

gues had accepted or agreed to accept what was a bribe.

In their closing arguments counsel on both sides had misinformed the jury. Neal had inaccurately told the jury that Counts Five through Eight were proved only if there had been an exchange. Lamprey had inaccurately told the jury that Counts One through Four did not require proof of a payoff and could be proved merely by showing that Rodrigues had used Saratoga for his own benefit. Lamprey had compounded his error by stating that Neal from the start had been trying to deceive the jury and had told the jury what was "flat out untrue."

■ Lamprey's argument concluded the day's proceedings; judge and jury left the courtroom. Promptly the next morning before the jury entered, Neal moved for dismissal of the indictment or a mistrial. As a fallback he asked for the opportunity to address the jury or a curative instruction from the court. He also asked that the indictment with its heading "The Kickback Transactions" be supplied the jury. Although Neal did not interrupt the government's closing argument with these motions, he made his motions as soon as practicable.

The district court, which did take the trouble to review the transcript of the argument and to think about the motions, exercised its discretion in denying them, but did not do enough to cure the confusion and eliminate the poison injected by the government's attack on the credibility of defense counsel. True, defense counsel had muddled the law on Counts 5 through 8, and the prosecutor would have been justified in saying that that had confused the jury. No basis existed in the trial record for telling the jury that "from the start" Neal had attempted to deceive the jury. No basis for this false accusation is suggested now by the government in its Reply Brief in this appeal. The accusation was a gratuitous attack on the veracity of defense counsel.

The accusation was compounded by characterizing as "flat out untrue" what was Neal's muddling of Counts One through Four with Counts Five through Eight. The prosecutor himself did something worse. Referring specifically to the loan transactions, he

stated that "under all the statutes" the government need prove only a benefit.

■ The instructions actually given correctly stated what the government had to prove. The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel. The presumption in this case is affected by the prosecutor's unwarranted attack on defense counsel's integrity and veracity. The last thing the jurors heard as they went home for the night and thought about the case they would have to decide the next day was that the representative of the United States held defense counsel to be a liar who from the beginning of the case had set out to mislead them. The representative of the United States does not speak as a mere partisan. He speaks on behalf of a government interested in doing justice. When he says the defendant's counsel is responsible for lying and deceiving, his accusations cannot fail to leave an imprint on the jurors' minds. And when no rebuke of such false accusations is made by the court, when no response is allowed the vilified lawyer, when no curative instruction is given, the jurors must necessarily think that the false accusations had a basis in fact. The trial process is distorted.

■ The extent of the distortion is difficult to measure. On the bribery counts proper the combination of misstatement of the law with slander of defense counsel was prejudicial to the point of denying Rodrigues a fair trial: the government simultaneously misled the jury on the law and denied the defendant the right to counsel unstained by unfair disparagement by the United States. Convictions on Counts One and Four have already been set aside. Convictions on Counts Two and Three must be reversed for denial of due process of law. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

■ Counts Five through Thirteen were among those labelled in the indictment "The Kickback Transaction." The charges made in these counts, although based on the underlying facts at the center of Counts One through Four, did not involve kickbacks but misuse of office and misrepresentations.

The prosecutor's unqualified claim that defense counsel had attempted to deceive the jury from the start arguably crippled the defense on every count. But the only lie specifically attributed to the defense by the prosecutor bore on Counts One through Four. As to Counts Five Through Thirteen, there was no misstatement of the law connected to the prosecutor's attack on defense counsel. Rather, the prosecutor's statement of the law did respond to defense counsel's misstatement. See *United States v. Young*, 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). We cannot say that it was more probable than not that the charge of deception affected the jury's verdict. *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir.1990).

Rodrigues's other objections to the trial are not persuasive.

*Conclusion.* The convictions on Counts One through Four and Fifteen through Nineteen are **REVERSED**; the convictions on Counts Five through Fourteen are **AFFIRMED**. Rodrigues has been proven to have engaged in real estate transactions which he unlawfully concealed from the authorities and which he should not have entered to the prejudice of Saratoga. The case is REMANDED for resentencing. We note that the government did not appeal the substantial downward departure by the district court in originally sentencing Rodrigues on each count of conviction to three years imprisonment to run concurrently. Unless new facts are drawn to the court's attention, the reasons for downward departure are undisturbed. A sentence is "a package," which takes into account the total offense conduct. *United States v. Handa*, 110 F.3d 42 (9th Cir.1997), amended 122 F.3d 690 (9th Cir. 1997). When half the package is undone, it would be strange if the effective sentence remained the same.

REINHARDT, Circuit Judge, concurring and dissenting:

I concur in the majority's decision to reverse Counts One through Four and Fifteen through Nineteen. I agree with the majority that the prosecutor's comments in this case were improper and amounted to a denial of

due process of law. I disagree with the majority only with respect to how far the taint of the prosecutor's comments extended. While the majority holds that the comments prejudiced the defendant only with respect to Counts One through Four, I would reverse as to Counts Five through Fourteen as well.[1]

While prosecutors are entitled to "prosecute with earnestness and vigor," they must "refrain from improper methods calculated to produce a wrongful conviction." *United States v. Young*, 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In this case, the prosecutor told the jury that "Mr. Neal has tried to deceive you from the start in this case about what this case is really about." The prosecutor also stated that "Mr. Neal has tried to pretend that his case is about kickbacks and about bribery.... I've never said either of those words." In short, as the majority states, the prosecutor cast the defense counsel as a "liar." (Opinion at 451). The prosecutor, moreover, implied to the jury that defense counsel had lied *about the very nature of the case.*[2] These comments were clearly improper.

A court reviewing improper prosecutorial remarks must determine whether the prosecutor's comments "infected the trial with unfairness" and thereby "ma[de] the resulting conviction[s] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). As the majority correctly notes, the last thing the jurors heard before beginning their deliberations was that "the representative of the United States held defense counsel to be a liar." (Opinion at 451). The majority captures the import of this fact perfectly. It determines that "the trial process [was] distorted." (Opinion at 451).

Having determined that the prosecutor's comments were in fact improper and that the trial process was distorted as a result, the majority then concludes, however, that Rod-

rigues was denied a fair trial only as to counts One through Four, the counts the majority describes as the bribery counts proper. While the majority admits that the "extent of the distortion" caused by the prosecutor's remarks is "difficult to measure," (Opinion at 451), it draws the line at Count Four.

The extent of the distortion caused by the prosecutor's allegation that defense counsel was a liar may be difficult to measure in some respects because, as is commonly understood, "liars" are invariably untrustworthy. That is, while a liar clearly cannot be trusted about the specific lie he has told, once someone is deemed a liar, he cannot be trusted on matters *generally.* By accusing defense counsel of lying about "what this case is about"—that is, of lying about the very nature of the case—the prosecutor prompted the jury to disbelieve everything defense counsel had argued. Accordingly, the prosecutor's comments may well have prejudiced Rodrigues with respect to every count charged, whether or not related to the "bribery" and "kickback" charges.

What should be beyond dispute, however, is that the accusation prejudiced Rodrigues' defense at least on those counts related to the government's allegations of bribery and kickbacks. By arguing to the jury that defense counsel lied about the "bribery" and "kickback" charges, the prosecutor unquestionably encouraged the jury to distrust the defense counsel on any count related to those misdeeds, and thereby tainted the jury's deliberations on those counts. Counts One through Four were quite clearly "bribery" counts, as the majority acknowledges: they alleged violations of 18 U.S.C. § 215, which requires that the defendant accept money or property with the intent to be influenced or rewarded. Counts Five through Eight are fairly indistinguishable from those counts. Counts Five through Eight alleged "fraudu-

---

1. I also concur in the majority's decision to reverse Counts Fifteen through Nineteen.

2. As the majority points out, the prosecutor's charges were patently untrue. In fact, defense counsel had every reason to believe that the prosecution's theory of the case was that Rodrigues had engaged in "kickbacks" and "bribes."

The prosecutor's charge was especially inappropriate given the fact that the prosecutor himself had drafted the Indictment and the Memorandum in Opposition to Defendant's Motion to Dismiss the Indictment, two documents which repeatedly employ the terms "kickbacks" and "bribes."

lent receipt of money and property" from the real estate transactions involved in Counts One through Four. A jury *admittedly prejudiced* against a defendant with respect to counts alleging that he "corruptly accepted or agreed to accept something of value," with the "inten[t] to be rewarded," from a set a real estate transactions would undoubtedly harbor prejudice against that same defendant on counts, which by their very terms, allege the "fraudulent receipt of money or property" from the same set of transactions. The distrust engendered by the prosecutor's improper comments surely extended to such closely related charges. The same is true, moreover, with respect to Counts Nine through Fourteen, counts that alleged various acts taken to conceal the bribery transactions set forth in Counts One through Four. Again, I fail to understand how a jury convinced that defense counsel lied to them about the "bribery" and "kickback" charges would be inclined to trust that same attorney on charges that the defendant attempted to conceal the bribery transactions.[3] The distrust, and hence the prejudice, clearly extended to these counts as well.

By casting defense counsel as a liar, the prosecutor tainted the jury's deliberations on all counts related to the government's allegations of bribery. Accordingly, I would reverse Rodrigues' conviction Counts One through Fourteen on account of the prosecutor's improper remarks.

---

3. It is undoubtedly because Counts One through Fourteen are so closely and clearly related that the government collected all these counts under the heading "Kickback Transactions" in the Indictment.

