**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jess A. RODRIGUES, Defendant–
Appellant.**

**No. 02–17311.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 13, 2003.

Filed Oct. 27, 2003.

Gerald F. Uelmen, Santa Clara University School of Law, Santa Clara, CA, for the defendant-appellant.

Robin L. Harris, Assistant United States Attorney, San Francisco, CA, for the plaintiff-appellee.

Before WALLACE, HALL, and O'SCANNLAIN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Jess Rodrigues appeals the district court's dismissal of his 28 U.S.C. § 2255 federal habeas petition. Rodrigues argues that the district court erred by denying his request for an evidentiary hearing to examine alleged conflicts of interest on the part of defense counsel. The panel has jurisdiction pursuant to 28 U.S.C. § 1291. Because Rodrigues has alleged no specific facts that, if true, would entitle him to relief under the actual conflict standard articulated in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), we AFFIRM.

## FACTS

### A. Background

Rodrigues owned and operated Saratoga Savings and Loan Association ("Saratoga") from 1982 to 1989. While under Rodrigues's control, Saratoga entered into several loan agreements with Richard Cristina, Murray Hall, Ronald Tate, and David Lazares to finance real estate ventures in San Francisco, San Jose, and Marina, California. In return for securing favorable loan terms for these applicants, Rodrigues received a personal stake in the underlying real estate ventures.

In November 1989, the Resolution Trust Corporation (RTC)[1] seized Saratoga and placed it under conservatorship. On May 24, 1990, the RTC was formally appointed as Saratoga's receiver. At that time, Saratoga's assets were liquidated and transferred to a new, federally chartered savings and loan.

Although Saratoga was no longer in his control after 1989, Rodrigues continued to own and operate California Housing Securities, Inc. ("Cal Housing"), Saratoga's parent company. In April 1992, Cal Housing received a $3.4 million tax refund for the tax years ending in 1984 and 1985. Around this time, Rodrigues filed suit against KPMG, an accounting firm, alleging that KPMG negligently performed tax and audit work for Saratoga.[2]

---

**1.** The RTC was "[a] corporation formed by Congress in 1989 to replace the Federal Savings and Loan Insurance Corporation and respond to the insolvencies of about 750 savings and loan associations. As receiver, it sold assets of failed S & Ls and paid insured depositors. In 1995 its duties, including insurance of deposits in thrift institutions, were transferred to the Savings Association Insurance Fund." Rupp's Insurance & Risk Management Glossary, *available at http:// insurance.cch.com/rupps/resolution-trust- corporation.htm* (last referenced September 23, 2003).

**2.** The record does not indicate whether Rodrigues filed suit before or after he received the tax refund. The record is also silent as to the

On March 30, 1994, a federal grand jury returned an indictment charging Rodrigues with 47 counts relating to his management of Saratoga, his participation in various real estate ventures, and his personal use of the 1992 Cal Housing tax refund. Nineteen counts were eventually tried to a jury, fourteen of which related to the real estate ventures, and five of which related to the Cal Housing tax refund.

### B. The relationship between Rodrigues, Joseph Russoniello, Cooley Godward, KPMG, and the RTC

Stephen C. Neal was lead defense counsel for Rodrigues. When Rodrigues originally retained Neal, Neal was a partner in the law firm of Kirkland & Ellis. On March 31, 1995, Neal left Kirkland & Ellis to join Cooley Godward.

Joseph Russoniello, the former U.S. Attorney for the Northern District of California, is a partner at the Cooley firm. Russoniello was involved in the early stages of the Rodrigues investigation during his tenure as U.S. Attorney. By the time Rodrigues was charged, Russoniello had left his position as U.S. Attorney to join Cooley. Russoniello did not participate in the Rodrigues case after joining Cooley, and appears to have been screened off from the matter. Both Rodrigues and the prosecutor were aware that Russoniello was one of Neal's partners at the Cooley firm.

Before Neal joined Cooley, the firm had represented the RTC in a significant litigation. There was a two week overlap in which Cooley concurrently represented both Rodrigues and the RTC, during which Cooley billed 0.4 hours of time to the RTC. By the time Rodrigues's trial began, Cooley no longer represented the RTC.[3] Cooley did not advise Rodrigues about its previous work for the RTC.

On December 20, 1995, while representing Rodrigues, Cooley was engaged by KPMG to provide real estate planning advice to a KPMG individual client. Cooley billed $671.50 to KPMG in connection with the matter. On December 6, 1996, Cooley was engaged to provide estate planning services to another KPMG client. Cooley billed $927.50 to KPMG in connection with the matter. Cooley did not advise Rodrigues about its relationship with KPMG.

### C. The Rodrigues trial and appeal

The prosecution's case against Rodrigues centered on testimonial and documentary evidence about four real estate transactions involving Rodrigues, Ronald Tate, David Lazares, Richard Cristina, and Murray Hall.

The prosecution introduced evidence that, on January 18, 1984, Rodrigues signed a letter on behalf of Saratoga committing Saratoga to participate in a joint venture with Tate and Lazares to purchase property located on Lick Avenue, in San Jose, California ("the Lick Avenue property"). Rodrigues later substituted himself for Saratoga and, in return for his role in the transaction, was given a one-third personal interest in the Lick Avenue property.

Later that same year, Rodrigues, Tate, and Lazares entered into a second joint venture to purchase a $500,000 property in Marina, California ("the Marina property"). In November 1984, Saratoga funded the closing by providing $456,000 to Tate and Lazares. Saratoga took no fees, and received only a normal rate of return on the loan. Rodrigues received a one-third

---

precise subject matter of the allegedly negligent audit, whether KPMG was indeed negligent, and when the audit took place.

**3.** Indeed, at the time of Rodrigues's trial, the RTC no longer existed as a government entity. *See supra* note 1.

interest in the Marina property in exchange for his role in the transaction.

In June 1985, Tate and Lazares sought a $1.6 million loan to purchase the Continental Can warehouse property in San Jose, California ("the Continental Can property"). Rodrigues told Tate and Lazares that they could each draw $800,000 on their personal lines of credit at Saratoga. According to Tate, Rodrigues originally informed them that Saratoga would charge a $200,000 fee for making the funds available, but later agreed to take a one-third interest in the Continental Can property in lieu of a fee. Rodrigues personally took a one-third interest in the property, and received one-third of the profit when it was sold in 1986.

In addition to the transactions involving Tate and Lazares, the prosecution also presented evidence that Rodrigues entered into a joint venture in 1984 with Richard Cristina and Murray Hall to purchase the Cinnabar Building, a warehouse in San Jose, California ("the Cinnabar property"). In connection with the transaction, Rodrigues arranged for Saratoga to provide Cristina and Hall with a $400,000 personal line of credit with no fees. As in the other real estate transactions, Rodrigues received a one-third interest in the property. Rodrigues did not record or disclose his personal interest in the Lick Avenue, Marina, Continental Can, or Cinnabar properties.

The prosecution also presented evidence that Cal Housing received a large tax refund in 1992 for the tax years ending in 1984 and 1985. The prosecution's evidence indicated that Rodrigues used approximately $1.2 million of the Cal Housing refund to pay off a loan on his personal residence, to open a personal checking account and a personal securities account, and to pay a bonus to the accountant who filed the tax returns.[4]

Rodrigues was convicted on all counts charged and sentenced to 36 months in prison, a $150,000 fine, and $3.6 million in restitution. After nine of the nineteen counts were reversed on appeal, including all of the counts related to the 1984 and 1985 tax refunds,[5] the district court reduced Rodrigues's sentence to time served, a fine of $7500, and restitution of $1.5 million.[6] This court affirmed the remainder of the conviction, holding that "there was no substantial dispute that [Rodrigues] received a benefit, that Saratoga lost a benefit, and that Rodrigues failed to disclose his interest." *United States v. Rodrigues*, 159 F.3d 439, 446 (9th Cir. 1998).

On July 31, 2001, Rodrigues brought a 28 U.S.C. § 2255 federal habeas corpus petition alleging due process violations and ineffective assistance of counsel. On October 17, 2001, the district court granted the motion in part and denied it in part. The court rejected Rodrigues's claim that he was denied effective assistance of counsel as a result of former U.S. Attorney Joseph Russoniello's status as a partner of the Cooley firm, and as a result of Cooley's

---

4. The prosecution introduced evidence that Rodrigues used $525,000 of the tax refund to pay off a personal indebtedness, $459,661.48 to pay off a loan on his personal residence, $100,000 to open a personal checking account, $100,000 to open a personal account at a securities firm, and $50,000 to pay a bonus to an accountant. *Rodrigues*, 159 F.3d at 446–449.

5. Rodrigues's convictions on counts 15–19, pertaining to Rodrigues's personal use of the tax refunds, were reversed for defects in the indictment. *See Rodrigues*, 159 F.3d at 446–448.

6. On remand from a second appeal, the district court further reduced Rodrigues's restitution to $200,000.

concurrent representation of KPMG, RTC, and Rodrigues. After holding an evidentiary hearing on several other issues not presented in this appeal, the district court denied the petition in its entirety. This appeal followed.

## STANDARD OF REVIEW

■■■ We review the denial of a 28 U.S.C. § 2255 petition *de novo.* *United States v. McMullen*, 98 F.3d 1155, 1156 (9th Cir.1996). Ineffective assistance of counsel claims are also reviewed *de novo. Id.* at 1157. A district court's decision to deny a motion for an evidentiary hearing is reviewed for an abuse of discretion. *Id.*

## ANALYSIS

### A. The Sullivan "Actual Conflict" Standard

■■■ In general, ineffective assistance of counsel claims are analyzed under the *Strickland* test, which has two components: "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland v. Washington*, 466 U.S. 668, 678, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the conflict of interest context, however, a defendant is relieved of the burden to prove prejudice. Instead, prejudice is presumed if a defendant demonstrates that his counsel labored under an "actual conflict of interest." *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d

333 (1980). An "actual conflict" is "a conflict *that affected counsel's performance—* as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (emphasis in original).[7]

The precise contours of the term "adverse effect" have been only generally defined by the post-*Sullivan* caselaw. The Second Circuit has expounded on the term in perhaps the greatest detail, holding that "a defendant must demonstrate that some plausible alternative was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir.2003) (quoting *United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir.2000)). "With respect to the substance of the plausible alternative strategy, the defendant need not show that the defense would necessarily have been successful had it been used, only that it possessed sufficient substance to be a viable alternative." *Id.*

Taking an approach consistent with that of the Second Circuit, the Ninth Circuit recently held that "[t]he showing must be that counsel was influenced in his basic strategic decisions" by loyalty to another client or former client. *United States v. Shwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002). In *Shwayder*, the conflict involved a defense attorney's previous representation of a key witness for the prosecution. The defendant contended that the attorney's professional relationship to the witness, his former client, restricted the attorney's ability to vigorously attack the witness's credibility. *Id.* The *Shwayder*

---

7. The *Mickens* court further elaborated in a footnote: "[T]he *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."

*Mickens*, 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291. *But see United States v. Shwayder*, 312 F.3d 1109, 1117 (9th Cir. 2002) (citing *Mickens*, but discussing "actual conflict" and "adverse effect" as two separate and distinct inquiries).

panel rejected this argument, noting that the attorney was not ethically restricted from vigorously cross-examining the former client, and that the attorney had actually impugned the witness's credibility several times throughout the trial. *Id.* at 1119–20. Under these circumstances, the attorney's relationship with his former client could not be said to have had an "adverse effect" on the attorney's ability to advocate on behalf of the defendant. *Id.* at 1120.

■ Although *Sullivan* involved a conflict between multiple clients represented by the same attorney, the term "actual conflict" is not a synonym for "direct conflict." An attorney has a duty of loyalty not only to his own clients, but also to all of his firm's clients. *E.g.,* ABA Model Rule 1.10, comment [6] ("A firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client."). The scope of this duty is equivalent to the duty of loyalty to an attorney's own client and, when in conflict with the interests of another client, has the same potential to adversely affect the quality of representation. For this reason, we reject Appellee's invitation to draw a distinction between direct and imputed conflicts for purposes of the *Sullivan* analysis. *See Reynolds v. Chapman,* 253 F.3d 1337, 1343 (11th Cir. 2001) (assuming, without deciding, that an imputed conflict can be an actual conflict within the meaning of *Sullivan* ); *United States v. Gallegos,* 39 F.3d 276, 278 (10th Cir.1994) (same); *Salam v. Lockhart,* 874 F.2d 525, 528 (8th Cir.1989) (same). Whether an alleged conflict is direct or imputed, "actual conflict" is a term of art defined by reference not to the nature of the alleged conflict itself, but to the effect of the conflict on the attorney's ability to advocate effectively. *Mickens,* 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 ("An 'actual conflict,' for Sixth Amend-

ment purposes, is a conflict of interest that adversely affects counsel's performance.").

## B. Burden of Proof

A district court must grant a federal habeas petitioner's motion for an evidentiary hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Although section 2255 imposes a fairly lenient burden on the petitioner, the petitioner is nonetheless "required to allege specific facts which, if true, would entitle him to relief." *United States v. McMullen,* 98 F.3d 1155, 1159 (9th Cir.1996). This standard requires the defendant to do more than simply allege a "conflict" or baldly assert that the asserted conflict had an "adverse effect." *See id.* ("There would be no point in raising the issue, and hence no ineffective assistance of counsel, unless there were some proof to offer in his favor.").

■ Synthesizing the federal habeas standard with the relevant Sixth Amendment authorities, the following test emerges: in order to be entitled to a hearing on a conflict of interest Sixth Amendment claim, a habeas petitioner has the burden of alleging specific facts which, if true, would indicate that: (1) an attorney's relationship to a third party influenced the attorney not to pursue a particular litigation strategy, and (2) the foregone litigation strategy would have been a viable alternative.

## C. The Alleged Russoniello Conflict

■ Rodrigues argues that Russoniello's affiliation with the Cooley firm impaired Neal's ability to present an effective defense because "the employment of Mr. Russoniello by the law firm representing him actually imposed limitations on his counsel that precluded any contact or consultation with Mr. Russoniello, limitations

that would not have applied were he represented by other counsel." Rodrigues's claim has no merit.

Russoniello represented the United States government during the early stages of the Rodrigues investigation. As Rodrigues observes, Russoniello's duty of confidentiality to the government therefore bars him from consulting with Neal about the Rodrigues case. *See* ABA Formal Ethics Opinion, 97–409 (August 2, 1997) (citing Model Rule 1.9(c)) (opining that a former government attorney may not use "information relating to her representation of the government to the disadvantage of her former government client where such information has not become generally known"). Russoniello's duty of confidentiality to the government, however, bears no relationship to his affiliation with the Cooley firm. The ethical rule barring Russoniello from consulting with Neal would have also barred Russoniello from disclosing information "not generally known" about the Rodrigues case to any other defense counsel. For this reason, the district court did not err by rejecting Rodrigues's claim that Russoniello's affiliation with the Cooley firm hindered his defense.[8]

## D. The Alleged RTC Conflict

■ Rodrigues contends that Cooley's attorney-client relationship with the RTC created an actual conflict of interest. Specifically, Rodrigues argues that, as a consequence of Cooley's relationship with the RTC, Neal "made no effort to investigate or present evidence of incompetence or negligence by the [RTC], which would

have been highly relevant to support [Rodrigues's] claim that he lacked fraudulent intent with respect to all of the transactions charged in the indictment." Rodrigues bears the burden of alleging specific facts which, if true, would indicate that: (1) negligence on the part of the RTC could have been used as part of a plausible defense strategy, and (2) Cooley's relationship with the RTC influenced Neal to forgo investigating and/or presenting the negligence defense. Rodrigues has not met this burden.

Neither the facts alleged in Rodrigues's petition nor our independent review of the record indicate that RTC played any role in the Lick Avenue, Marina, Continental Can, or Cinnabar transactions that formed the basis for the bulk of the charges against Rodrigues. Indeed, the RTC was not appointed receiver of Saratoga until 1989, several years after the four real estate transactions took place.

The RTC was named as a victim in Count 19 of the indictment, which charged that Rodrigues's personal use of the Cal Housing tax refund unlawfully impeded the RTC's ability, as receiver of Saratoga, to apply for a portion of the refund.[9] The RTC's status as a named victim alone, however, does not establish an actual conflict of interest. *See Mickens,* 535 U.S. at 172, 122 S.Ct. 1237 (holding that a defense attorney's client relationship with a victim is a "potential," rather than "actual," conflict for purposes of the *Sullivan* inquiry). Neither Rodrigues's petition nor any other portion of the record indicates that the RTC played any role in Rodrigues's deci-

---

**8.** Rodrigues also alleges that he believed Russoniello's presence at Cooley "would actually enhance his defense." This allegation is not relevant to the Sixth Amendment inquiry. Rodrigues's state of mind bears no relationship to whether Neal's ability to defend Rodri-

gues was adversely affected by Russoniello's affiliation with the firm.

**9.** Count 19 was reversed in an earlier appeal on the ground that the indictment failed to alleged a crime. *See Rodrigues,* 159 F.3d at 448–449.

sion to use more than one million dollars of the Cal Housing tax refund to pay off his personal debts and to supplement his personal checking and securities accounts. Accordingly, Rodrigues has not met his burden of alleging specific facts that, if true, would demonstrate that the RTC's negligence could have been used as part of a viable defense strategy.

Rodrigues also argues that Cooley's relationship with the RTC led Neal to avoid cross-examining Tate and Lazares about a settlement agreement they entered into with the RTC in 1991. Rodrigues suggests that Neal could have impeached Tate and Lazares by arguing that they received favorable settlement terms from the RTC, a government agency, in exchange for testifying for the government against Rodrigues. In the district court, Neal explained that he did not pursue this strategy because "he did not believe that the settlement document could reasonably be read to suggest that it was a witness cooperation agreement, and thus the issue could not be credibly argued." On this basis, the district court held that Neal had made an informed tactical decision.

Rodrigues did not appeal this portion of the district court's decision, and with good reason. The record provides no support for Rodrigues's claim that the settlement gave Tate and Lazares "RTC-arranged rewards for their testimony." The settlement agreement resolves the rights and liabilities of the RTC, Tate, and Lazares with respect to four unrelated properties in Santa Clara and Santa Cruz County, and was signed approximately five years before Rodrigues's trial. The text of the settlement agreement does not refer to the Rodrigues investigation, nor does it purport to obligate Tate or Lazares to cooperate with the government in any future legal proceedings.

Despite the dearth of evidence to support his theory that Tate and Lazares were paid by the government to testify against him, Rodrigues now suggests that the reason Neal declined to present this theory at trial was because the RTC was a former client of the Cooley firm. The record belies Rodrigues's assertion. As discussed above, the 1991 settlement between the RTC, Tate, and Lazares could not have been credibly argued as a witness cooperation agreement. Thus, the non-viability of the witness cooperation theory, rather than the firm's relationship with the RTC, appears to have been Neal's motivation for not introducing the settlement agreement at trial.

Moreover, even assuming that the witness cooperation theory was viable, Rodrigues has not alleged any facts to support his theory that Cooley's relationship with the RTC would have influenced Neal to avoid impeaching Tate and Lazares. Rodrigues suggests that Neal would have been ethically restricted from impeaching Tate and Lazares with the settlement agreement. No rule of ethics, however, bars an attorney from impeaching a third party witness by introducing non-confidential information about the witness's relationship with one of the attorney's former clients. Rodrigues also suggests that Neal was motivated by the desire to obtain future business from the RTC. It is quite improbable, however, that Neal would have perceived the option of cross-examining Tate and Lazares as something that would hinder his firm's ability to obtain additional business from the RTC. Indeed, the RTC no longer existed as an independent governmental entity by the time the Rodrigues trial took place[10] and was therefore a

---

10. The RTC's functions were assumed by the Savings Association Insurance Fund in 1995.

See *supra* note 1.

very unlikely source of future business for the Cooley firm.

Rodrigues has not met his burden of alleging specific facts that, if true, would demonstrate that Cooley's former representation of the RTC created an actual conflict within the meaning of *Sullivan.* The district court properly denied his request for an evidentiary hearing on this issue.

## E. The Alleged KPMG Conflict

 Rodrigues's petition also alleges that Cooley's concurrent representation of KPMG created an actual conflict of interest. According to Rodrigues, Cooley's relationship with KPMG hindered Neal from introducing evidence that KPMG negligently conducted a financial audit related to "the tax returns in dispute in [his] indictment" and "the four transactions which were alleged to be fraudulent in Counts Five through Fourteen." In order to be entitled to an evidentiary hearing, Rodrigues bears the burden of alleging specific facts which, if true, would indicate that: (1) KPMG's negligence was indeed a viable defense, and (2) Cooley's relationship with KPMG influenced Neal to forgo the negligence defense. Rodrigues has not met this burden.

The ten-count conviction challenged in Rodrigues's habeas petition is premised entirely on Rodrigues's role in the Lick Avenue, Marina, Continental Can, and Cinnabar real estate transactions. According to Rodrigues, evidence that he "sought a responsible audit from KPMG for these transactions was crucial to corroborate [his] defense of good faith." That generalized assertion is insufficient to satisfy Rod-

rigues's burden. Despite Rodrigues's direct involvement in the lawsuit against KPMG, detail about the timing and scope of the KPMG audit is conspicuously absent from his habeas petition and his briefs before this court. The record contains no indication that the KPMG audit occurred prior to or contemporaneous with the four real estate transactions at issue, or that the KPMG audit would otherwise be relevant to Rodrigues's state of mind at the time of the conduct forming the basis for the charges. Notably, Rodrigues does not contend that his conscious decision to take a personal stake in four real estate projects to the detriment of Saratoga was induced or approved in any manner by KPMG. Rodrigues's bare allegation that KPMG's negligence could have been a defense to the real estate transaction charges, without more, is insufficient to entitle him to an evidentiary hearing. *See McMullen,* 98 F.3d at 1159 (A petitioner is "required to allege *specific facts* which, if true, would entitle him to relief") (emphasis added).

Rodrigues also argues that KPMG's negligence could have been a defense to the charges arising out his use of Cal Housing's 1984 and 1985 tax refunds.[11] According to Rodrigues, KPMG filed "erroneous" tax returns, which were later corrected and amended by an internal Saratoga accountant. Rodrigues also alleges that KPMG negligently failed to audit the returns. Rodrigues has alleged facts that, if true, might support a negligence or malpractice case against KPMG. Rodrigues has not, however, established that these alleged acts of negligence could have been offered at trial as a viable defense to any

11. We note that all of the counts relating to the 1984 and 1985 tax refunds were overturned by this court in *United States v. Rodrigues,* 159 F.3d 439 (9th Cir.1998) and are thus not directly challenged in Rodrigues's

habeas petition. For purposes of this appeal, we assume, without deciding, that a conflict that directly impacted only the now-reversed tax refund counts could constitute an "actual conflict" within the meaning of *Sullivan.*

of the charges against him. The charges brought against Rodrigues did not relate to the tax return itself, but rather to Rodrigues's decision to use more than one million dollars of the tax return to pay off personal debt obligations and to supplement his personal checking and securities accounts. The record is devoid of any indication that KPMG's conduct, negligent or otherwise, had any impact on Rodrigues's decision to undertake these actions.

As noted above, Rodrigues bears the burden of alleging specific facts indicating that the relationship between Cooley and KPMG adversely affected his defense. Given the Cooley firm's significant involvement in the Rodrigues case, the relationship between KPMG and the Cal Housing tax refunds, and the 1992 litigation between Rodrigues and KPMG, a prudent law firm in Cooley's position might have chosen either to decline the KPMG representation or to specifically disclose the representation to Rodrigues. In this appeal, however, we do not have occasion to second-guess Cooley's professionalism or business judgment. Our task is narrowly limited to resolving the Sixth Amendment claim presented in Rodrigues's habeas petition. Under the applicable Sixth Amendment standard, Rodrigues is not entitled to relief unless he can allege specific facts that, if true, would demonstrate "that counsel was influenced in his basic strategic decisions" by loyalty to another client or former client. *Shwayder*, 312 F.3d at 1118 (citing *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). Rodrigues has not made this showing. Neither Rodrigues's petition nor the record as a whole contains factual support for Rodrigues's claim that KPMG's negligence would have been a viable defense. Accordingly, the district court properly held that Cooley's relationship with KPMG did not create an "actual conflict" within the meaning of *Sullivan*.

## CONCLUSION

Rodrigues has not met his burden of alleging specific facts that, if true, would demonstrate that Cooley's relationship with Russoniello, KPMG, or the RTC adversely affected his defense. Because the facts alleged by Rodrigues do not satisfy the actual conflict standard articulated in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the district court properly denied Rodrigues's petition.

**AFFIRMED.**