**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ROBERT VAIO WELLS,
*Defendant-Appellant.*

No. 03-35178

D.C. Nos.
CV-97-00016-CCL
CR-90-00020-CCL
CV-90-00042-CCL
CR-90-00005-CCL

OPINION

Appeal from the United States District Court
for the District of Montana
Charles C. Lovell, District Judge, Presiding

Argued and Submitted
July 12, 2004—Seattle, Washington

Filed January 11, 2005

Before: Betty B. Fletcher, Clyde H. Hamilton,* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Hamilton;
Dissent by Judge B. Fletcher

---

*The Honorable Clyde H. Hamilton, Senior United States Circuit Judge, United States Court of Appeals for the Fourth Circuit, sitting by designation.

**COUNSEL**

Marcus S. Topel and Daniel F. Cook, Topel & Goodman, San Francisco, California, for the defendant-appellant.

James E. Seykora and Bernard F. Hubley, Assistant United States Attorneys, Helena, Montana, for the plaintiff-appellee.

**OPINION**

HAMILTON, Senior Circuit Judge:

In August 1991, a jury in the United States District Court for the District of Montana convicted Robert Wells of con-

spiracy to defraud the United States, 18 U.S.C. § 371, conspiracy to manufacture and distribute methamphetamine, 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to invest illegal drug profits into a business, *id.* §§ 854 and 846, investment of proceeds from drug transactions into a business, *id.* §§ 854 and 855, and distribution of methamphetamine, *id.* § 841(a)(1). After unsuccessfully pursuing his remedies on direct appeal, Wells filed a motion pursuant to 28 U.S.C. § 2255, which the district court denied. We granted a certificate of appealability limited to the issue of whether an actual conflict of interest adversely affected Wells' counsel's representation of him. We affirm.

I

As found by this court on direct appeal, the facts underlying Wells' convictions are as follows:

[Don] Wogamon testified that he began manufacturing and distributing methamphetamine with Daniel Jones in 1983. The following year, Jones introduced Wogamon to Robert Wells. Wells gradually became more involved with Wogamon in the manufacturing process. Wogamon said that he and Wells "cooked" methamphetamine a number of times over the next couple of years.

In 1984, Wogamon formed a corporation called Medallion Minerals for the purpose of mining gold in the Butte, Montana area. Proceeds from drug sales were deposited in Medallion in order to make the income look legitimate. Wells and Jones agreed to invest $1.8 million in Medallion from their methamphetamine manufacturing business. They received stock from the corporation in exchange. During 1984 and 1985, Wogamon helped Wells and Jones with their manufacturing in Santa Rosa, California and flew back to Montana with money to deposit in

Medallion accounts. All deposits were under $10,000 to avoid having the banks file currency transaction reports. The cash was reflected as gold sales on Medallion's books.

Wells and Jones had a falling out in early 1985, and Jones decided not to finance Medallion further. Wogamon said he last saw Jones in February of 1985. In June 1985, William Morris, a longtime friend of Wogamon's, introduced him to Gene Browning, who was involved in the mining business. Browning had developed a device to extract gold from ore, and was trying to find interested investors. Wogamon and Wells agreed to put one million dollars into Browning's Nevada corporation. The money was delivered in four $250,000 cash payments.

Browning subsequently introduced Wogamon to William Nowlin. Nowlin was looking for investors to fund a mining venture. In July 1985, Wogamon and Wells agreed with Nowlin to provide one million dollars to fund a new company called Shadow Mountain Systems, Inc. In exchange, they received an interest in the corporation. The million dollars was paid in four $250,000 cash installments. Nowlin used the money to purchase equipment for Shadow Mountain. Wogamon testified he informed Nowlin that the money came from the proceeds of drug sales.

In September 1985, Wells and Wogamon manufactured a fifty pound batch of methamphetamine at the Santa Rosa laboratory. After completing the batch, Wells was arrested with twenty-five pounds in his car. Wells had entered Nowlin's house while state agents were executing a search warrant. An agent patted down Wells and felt a hard object in his pants

pocket. The agent removed a film cannister from Wells' pocket and opened it. It contained a small amount of methamphetamine. Since the agent improperly opened the cannister, the district court suppressed evidence of the methamphetamine found therein and the twenty-five pounds subsequently seized from Wells' car. Nevertheless, Wogamon testified at trial that Wells told him that he had been arrested with the twenty-five pounds. This testimony was presented by the government to explain the facts and circumstances concerning the moving of the drug lab from Santa Rosa to near Las Vegas.

The lab equipment was initially moved to trailers located on Shadow Mountain's property. Nowlin had keys to the trailers and allowed Wells and Wogamon to put the equipment there. Wells and Wogamon attempted to manufacture methamphetamine at the site, but their efforts were not very successful. Wogamon testified that Nowlin occasionally came to the site and asked what was going on.

At one point, when there was $250,000 cash infusion into Medallion that needed to be covered, Morris agreed to put together a story and supporting documentation to show that the cash had come from the International Fuel Development Corporation, a foreign corporation. The cash was, in fact, proceeds from methamphetamine sales.

In March 1986, Medallion Minerals filed for bankruptcy, and Morris prepared the necessary filings. Morris filed a false bankruptcy Disclosure Statement with the bankruptcy court. In October 1986, a grand jury subpoena was issued requiring Medallion to produce its records and books. In an effort to buy time, Morris suggested that he hold himself out as custodian of Medallion's records. This gave Woga-

mon and Morris time to alter corporate documents and create minutes of meetings that never occurred in an effort to throw off the grand jury.

During his efforts to "fix" the records, Morris caused 3.1 million shares of Medallion stock to be issued to himself in order to cover the $250,000 in drug sale proceeds that was supposed to have been received from the International Fuel Development Corporation. Wogamon also testified that he and Morris altered records to reflect gold production and sales that never occurred in order to cover drug money deposits.

Wogamon was indicted in May of 1987. Although Morris initially served as his attorney, he was eventually replaced and ultimately named in the subsequent indictment filed in September of 1990.

*United States v. Nowlin*, 988 F.2d 124 (Table), 1993 WL 51814, at *1-3 (9th Cir. March 1, 1993).

On February 23, 1990, Jones and Wells were indicted on one count of distributing methamphetamine, 21 U.S.C. § 841(a) (the Butte Indictment). Subsequently, on September 21, 1990, the government filed a seven-count indictment against Jones and Wells, as well as three other individuals (William Morris, William Nowlin, and Gene Browning) (the Helena Indictment). All five defendants were charged in three of the counts: conspiracy (between 1984 and 1990) to defraud the United States by impeding, impairing, obstructing, and defeating the IRS in the ascertainment, computation, assessment, and collection of revenue, 18 U.S.C. § 371 (Count One); conspiracy to manufacture and distribute methamphetamine, 21 U.S.C. §§ 841(a)(1) and 846 (Count Four); and conspiracy (between 1984 and 1990) to invest illegal drug profits into a business, *id.* §§ 854 and 846 (Count Five). All of the defendants except Jones were charged in Count Six

with investment of proceeds from drug transactions into a business, *id.* §§ 854 and 855. Browning was charged in Count Seven with making a false declaration, 18 U.S.C. § 1623. Wells and Jones were charged in Counts Two and Three with filing false corporate tax returns, 26 U.S.C. § 7206(2). Browning entered into a plea agreement with the government and the remaining defendants proceeded to trial.

Prior to trial, Wells' counsel, Joseph "Sib" Abraham, Jr., filed several motions including a motion to suppress. Through Abraham's efforts, the district court entered an order suppressing the 9mm handgun, the methamphetamine in the cannister, and the twenty-five pounds of methamphetamine seized from Wells' car in September 1985.

On July 8, 1991, the case went to trial. Just before the trial began, the district court denied Jones' motion for severance, ostensibly because Jones failed to file any declaration that a codefendant had exculpatory evidence regarding Jones that could be presented at a separate trial. After the noon recess, counsel for Jones submitted in open court a declaration executed by Wells in support of Jones' severance motion.[1] Coun-

---

[1]The declaration stated:

After consultation with my counsel, I have determined I will not testify during the trial of the instant cause.

It has been explained to me that I have an absolute right not to testify at the trial of my case and that I am quaranteed (sic) pursuant to the Fifth Amendment of the Constitution of the United States that particular right.

However, I represent to the Court that if I were given a separate trial from my codefendant, Daniel Jones, I would be in a position to provide significant exculpatory testimony on his behalf.

I understand that there are certain issues regarding whether or not the statute of limitations would bar a prosecution of my codefendant Mr. Jones.

If called to testify by Mr. Jones at a separate trial, I would clearly indicate under oath that in fact Mr. Jones manifested a clear

sel for Jones argued that Wells would testify at a separate trial that Jones severed his business ties with Wogamon and Wells in 1985. Counsel further suggested that this testimony would support Jones' statute of limitations defense. In response to the declaration and counsel's argument, the district court did not alter its ruling denying Jones' motion for severance.

After a lengthy trial, the jury found Wells guilty of the one count in the Butte Indictment and four counts in the Helena Indictment (Counts One, Four, Five, and Six). Wells was acquitted of Counts Two and Three of the Helena Indictment. Of note, Jones was found not guilty of Counts One, Two, and Three of the Helena Indictment. As to Jones, the jury could not reach a verdict on Counts Four and Five of the Helena Indictment and the one count in the Butte Indictment.

On December 8, 1991, Wells was sentenced under pre-Sentencing Guidelines law. In the Helena case, Wells was sentenced to thirty years on Count Four, ten years on Count Five to run consecutive to the thirty-year sentence on Count Four, five years on Count One to run consecutive to the sentences on Counts Four and Five, and ten years on Count Six to run concurrent to the sentences on Counts One, Four, and Five. In the Butte case, Wells was sentenced to thirty years to run concurrent with the sentences in the Helena case. Thus, Wells received a total sentence of forty-five years' imprisonment.[2]

---

intention to withdraw from all activity involving the allegations in the Indictment in this case and did so in March of 1985.

Mr. Jones told me he wanted to have nothing to do with any activity that Donald Wogamon was engaged in from that time forth.

Finally, I would state that Mr. Jones did affirmatively abandon any relationship with myself, Mr. Wogamon, or any other party to our activity and further abandoned all economic and financial interest in our ventures.

[2]After Wells was sentenced, Jones was retried and a jury acquitted him of all charges.

On direct appeal, we affirmed Wells' convictions, rejecting Wells' sole argument that his convictions were infirm because the district court improperly allowed the jury to hear testimony about Wells' alleged statements about his arrest for possession of twenty-five pounds of methamphetamine. On October 4, 1993, Wells' petition for a writ of certiorari was denied by the United States Supreme Court. *Wells v. United States*, 510 U.S. 827 (1993).

On April 17, 1997, Wells filed a § 2255 motion in the United States District Court for the District of Montana. The motion alleged that Abraham had an actual conflict of interest that adversely affected Abraham's representation of Wells because Abraham's attorney's fees were paid by Jones and Abraham breached his duty of loyalty to Wells by taking actions favorable to Jones and unfavorable to Wells.

On September 25, 2002, the district court held an evidentiary hearing at which both Wells and Abraham testified. Wells testified that he first met Abraham after he was transferred from California to Helena, Montana to await trial. According to Wells, in their first meeting, Abraham told him that his attorney's fees were being paid by Jones. Wells testified that, during this first meeting, he asked Abraham what his "options" were, implying that he was interested in a plea bargain. According to Wells, Abraham indicated that he was not interested in representing a defendant who wanted to cooperate with the government, adding that he did not represent "snitches."

Wells also testified that Abraham did not disclose or discuss a potential conflict of interest with him and that Abraham did not spend any time with him preparing his defense. Wells testified that Abraham never explained the consequences of the declaration he executed in support of Jones' severance motion. Wells acknowledged that he had an extensive criminal history, including numerous drug convictions, and that he spent nine to ten years in prison between 1960 and 1988.

Wells testified that Abraham never discussed with him, either before his trial, after his trial, or while Jones was awaiting his retrial, the possible advantages of seeking a plea bargain with the government.

During his testimony, Wells, invoking his Fifth Amendment privilege against self-incrimination, refused to answer questions concerning his relationship with Jones. According to Wells' counsel, whatever relationship Wells may have had with Jones had "nothing to do with Mr. Abraham's legal obligations in representing" him. At the hearing, the district court expressed skepticism about Wells' invocation of his Fifth Amendment privilege, commenting that the government was pursuing a relevant inquiry in an attempt to "show a long-term financial relationship, a financial relationship that goes directly to the bearing of whose money this was, what was owed to whom and so forth."

For his part, Abraham testified that he met with Wells for the first time in 1991, while Wells was incarcerated in Helena, Montana. In the meeting, Wells agreed to have Abraham handle his case, and Abraham told Wells that Mike Pancer (Jones' counsel) and Dennis Roberts (a California attorney who had represented Wells in the past) were going to pay his fee. When asked the source of the funds, Abraham testified that he had "[t]he idea" that the source of the funds was "Danny Jones." Abraham also testified that he did not believe there was any conflict of interest. He testified to having, with Wells' consent, a "Joint Defense and Confidentiality Agreement" (the Joint Defense Agreement) with the codefendants and their counsel. He admitted he probably told Wells that he would not represent a "snitch" and that he does not represent defendants that are interested in cooperating with the government. He testified that he discussed the defense strategy with Wells, which was to show that the testimony of the government witnesses was unreliable.

Abraham also testified that he or someone else prepared Wells' declaration in support of Jones' severance motion and

that he went over the declaration with Wells, explaining its ramifications. According to Abraham, Wells was adamant that he and Jones were involved in a legitimate gold mining operation and that Jones had severed his business ties with the operation in 1985. Abraham acknowledged that the declaration did not "necessarily assist" Wells, but that Wells "wanted to do it" because Wells and Jones were friends and Wells thought the charges against Jones were "bogus." Abraham testified that he did not believe that the government could make use of the declaration ostensibly because everyone understood the declaration to mean that Wells would testify at a separate trial that Jones was no longer involved in the legitimate gold mining operation after 1985. Abraham added that the government made no use of the declaration at trial.

On October 31, 2002, the district court denied Wells' § 2255 motion. The court initially noted that Wells manufactured large quantities of methamphetamine and laundered 1.6 million dollars in drug sale proceeds. The court also noted we found on direct appeal that the evidence against Wells was overwhelming. The court noted that Wells had a lengthy criminal history and was no stranger to the criminal justice system.

The district court further found that, after Wells' arrest, he initially attempted to hire Dennis Roberts, who had represented him in the past. Wells did not discuss a fee payment with Roberts and did not know who paid Roberts to appear at his arraignment. Roberts did not represent Wells because of other commitments.

The district court made extensive findings concerning Abraham's representation of Wells. The court found that Wells' decision to go to trial was made before Abraham ever entered the case. In fact, the court found that Wells wanted an experienced *trial* attorney to handle his case because he (Wells) had no intention of pleading guilty or cooperating with the government. The court found that Wells knew that the funds used to retain Abraham came from Jones, but the

court also found that Wells refused to disclose whose money (Jones or Wells') actually was being paid to Abraham.[3]

Because Wells refused to testify regarding his relationship with Jones and, particularly, his financial relationship with Jones, the district court drew an adverse inference from Wells' failure to answer the questions. In its written order, the court stated: "The Court believes that the money advanced by Danny Jones for Wells' representation could in fact have been owed by Jones to Wells. The money might even be Wells' funds and not Jones' funds." *Wells*, Nos. CV 97-16-H, 97-42-BU, slip op. at 8. The court added, "this is not a case where a drug mule or courier was represented by counsel provided by the codefendant drug boss." *Id.*

The district court also made extensive findings concerning Abraham's effectiveness as Wells' attorney. The court found that Abraham was successful in suppressing a large amount of methamphetamine and a 9mm handgun; made an appropriate opening statement and closing argument; vigorously cross-examined the government's witnesses; and was intelligent, competent, and vigorous in his representation of Wells. The court also found that Abraham was an experienced and talented attorney who had practiced criminal law for forty-one years; had specialized in trial work; and had tried approximately twenty cases each year of his practice. The court found Abraham to be a credible witness, although the court did express some concern that Abraham "may have understated his testimony to favor" Wells. *Id.* at 10.

---

[3]Wells testified that, in 1995, Jones told him that he (Jones) paid Abraham $100,000 for the trial and $30,000 for the appeal. Abraham testified that he was paid $60,000 for the trial and $25,000 for the appeal. Wells received $10,000 "indirectly" from Jones in order to hire an attorney to file his § 2255 motion. *United States v. Wells*, Nos. CV 97-16-H, 97-42-BU, slip op. at 7 (D. Mont. October 31, 2002). The record reflects that Wells "borrowed" money from Jones to pursue his § 2255 motion.

The district court then turned to its findings concerning the existence of an actual conflict of interest. The court found that Abraham told Wells that he did not represent "snitches" and "by that [Abraham] meant that he specialized in trying cases." *Id.* at 10-11. Abraham told Wells that he had been hired by Jones, and Wells told Abraham that this arrangement for representation was acceptable. The court found that Wells was not concerned that Abraham did not represent snitches because Wells was not and did not consider himself a snitch. Wells simply had no intention of pleading guilty or cooperating with the government.

In making its findings concerning the effect of the fee arrangement on Abraham's representation of Wells, the district court stated the case was hard-fought pursuant to the Joint Defense Agreement and counsel put on a vigorous defense. The district court also found that Wells' assertion that he would have been interested in pleading guilty in return for the court's leniency was "simply not credible." *Id.* at 12. In this regard, the court found that Wells was unwilling to testify as a witness for the government and was not concerned that Abraham "did not plan to seek a plea agreement from the government." *Id.* The court found that Wells simply had no intention of pleading guilty and/or accepting responsibility for the multi-million dollar quantities of methamphetamine involved in the drug conspiracy. The court also found that Abraham discussed strategy with Wells, both before and during the trial.

The district court next addressed Abraham's handling of Wells' declaration filed in support of Jones' severance motion. The court found that Abraham had asked Wells if he wanted to help Jones by submitting a written declaration to the court corroborating Jones' statute of limitations defense. The court also found that Wells willingly agreed. The court found that Wells' written declaration offered in support of Jones' severance motion was not used against Wells in any way nor could it have been used against him given his defense

strategy. The court also found that the written declaration merely "parroted" Wells' defense strategy and did not prevent Wells from testifying at trial. *Id.* at 15. Finally, the court found that Wells was advised not to testify because of his extensive criminal history.

Based on the above findings, the district court concluded that there had been no actual conflict that adversely affected Abraham's performance in representing Wells. The court further found that, considering Wells' age, education, intelligence, and criminal history, he waived any potential conflict of interest. Accordingly, the court denied Wells' § 2255 motion.

Wells filed a timely notice of appeal and requested a certificate of appealability from the district court, which the district court denied. We granted a certificate of appealability limited to the issue of whether an actual conflict of interest adversely affected Abraham's representation of Wells.

## II

Wells contends that the district court erred when it concluded that he failed to demonstrate that an actual conflict of interest adversely affected Abraham's performance. More specifically, Wells contends that the fee arrangement—that Abraham's fee was paid by Jones—adversely affected Abraham's representation of Wells.[4] We review the district court's

---

[4]Like the district court, we do not countenance Wells' unwillingness to testify concerning the *true* source of the funds paid to Abraham. In our view, Wells should not be permitted to argue that Jones paid his attorney's fees without first answering the question of whether or not the money paid to Abraham was his (Wells') money by way of Jones. After all, if the money paid to Abraham was Wells' money, Wells' case falls flat on its face. To resolve this case, however, we do not need to reach the question raised by Wells' evasiveness because his conflict of interest claim fails even if Jones paid Abraham his fee.

denial of a § 2255 motion *de novo*. *United States v. Ratigan*, 351 F.3d 957, 961 (9th Cir. 2003).

**[1]** Under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel at trial. This right includes the entitlement to representation that is free from conflicts of interest. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "In order to establish a violation of the Sixth Amendment [based on a conflict of interest], a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). If this standard is met, prejudice is presumed. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003).

**[2]** Of note, "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect." *Mickens*, 535 U.S. at 172 n.5; *see also Rodrigues*, 347 F.3d at 823 & n.7 (rejecting dual inquiry); *United States v. Shwayder*, 312 F.3d 1109, 1117-20 (9th Cir. 2002) (citing *Mickens* and discussing "actual conflict" as an initial step in determining whether there was the requisite "adverse effect"), *cert. denied*, 124 S. Ct. 181 (2003). Under this standard, an " 'actual conflict' " is "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171; *see also United States v. Baker*, 256 F.3d 855, 860 (9th Cir. 2001) (noting that an "attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action") (citation and internal quotation marks omitted). In *Shwayder*, we held that, to prove an adverse effect, the defendant must show that "counsel was influenced in his basic strategic decisions" by loyalty to another client or former client. 312 F.3d at 1118 (citation and internal quotation marks omitted). In other words, to show adverse effect,

a defendant need not demonstrate prejudice—that the out-come of his trial would have been different but for the conflict—but only "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996) (citation and internal quotation marks omitted).

**[3]** In this particular case, we have no doubt that the fee arrangement created a "theoretical division of loyalties." *Mickens*, 535 U.S. at 171. The Supreme Court in *Wood v. Georgia* made this clear when it stated:

> Courts and commentators have recognized the inher-ent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the opera-tor of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testi-mony against his former employer or from taking other actions contrary to the employer's interest.

450 U.S. 261, 268-69 (1981) (footnotes omitted); *see also In re Grand Jury Subpoena Served upon Doe*, 781 F.2d 238, 248 n.6 (2d Cir. 1986) (en banc) ("Accepting payment of clients' fees from a third party may subject an attorney to undesirable outside influence, particularly . . . in criminal matters [where] the third party is the head of a criminal enterprise of which the clients are members. In such a situation, an ethical question arises as to whether the attorney's loyalties are with the client or the payor."). Thus, the question before us is whether the fee arrangement, which created a theoretical division of loyalties, adversely affected Abraham's representation of Wells.

A

Wells argues that the fee arrangement adversely affected Abraham's representation of him because Abraham enticed

him to sign the declaration in support of Jones' severance motion. According to Wells, without his loyalty to Jones, Abraham would have discouraged Wells from signing the declaration because the declaration essentially prevented Wells from testifying at trial.

Abraham testified that he explained the "high points and low points" of the declaration to Wells. Abraham acknowledged that the declaration did not "necessarily assist" Wells, but that Wells "wanted to do it" because Wells and Jones were friends and Wells thought the charges against Jones were "bogus." Abraham testified that he did not believe that the government could make use of the declaration and pointed out that the government indeed did not use the declaration in any manner. Abraham also testified that the reason he advised Wells not to take the stand was Wells' extensive criminal history.

[4] With regard to the declaration, we do not see how the fee arrangement adversely affected Abraham's handling of the issue. First, there was no assertion in the district court habeas proceedings that Wells had, at any time, an intention to testify at trial. In fact, Abraham advised Wells not to take the stand because of his extensive criminal history and this advice was eminently reasonable under the circumstances. Thus, if having Wells testify was an implausible or unsound defense strategy, it cannot be said that the fee arrangement adversely affected Abraham's handling of the declaration issue because the interests of Jones and Wells never diverged with regard to that strategic decision. *Stantini*, 85 F.3d at 16.

[5] In any event, even if having Wells testify represented a sound trial strategy, which it did not, the result would be no different. Wells' defense was based on the assertion that he and Jones were involved in a legitimate business. All parties, including the government and the district court, viewed the declaration as an indication that Jones left the legitimate gold mining operation in 1985. Nothing in the declaration admitted

the truth of the criminal allegations in the indictment. If there had been any implication of such an admission, surely the government would have sought to introduce the declaration, yet it did not. A statement regarding when Jones' involvement in the assertedly legitimate enterprise terminated certainly did not conflict with Wells' defense or support the criminal indictment.

B

Wells also contends that the fee arrangement prevented Abraham from entering into plea negotiations with the government, either before or after his trial. We disagree.

**[6]** Wells has an extensive criminal record. He is familiar with the criminal justice system and the plea bargaining process. However, in this particular case, Wells was unwilling to plead guilty and was unwilling to cooperate with the government in any fashion, as the district court so found. If Wells was unwilling to plead guilty or cooperate with the government, either before or after his trial, it cannot be said that Abraham's performance as Wells' counsel was adversely affected by his failure to engage in futile plea negotiations with the government, even though, in a hypothetical sense, Wells may have obtained a reduced sentenced by testifying against Jones at his retrial. In view of Wells' unwillingness to plead guilty and/or cooperate, Abraham had nothing to offer the government, even after the verdict. Thus, we are constrained to conclude that Wells' decisions, not those of Abraham, prevented Wells from pursuing a plea bargain with the government. *Cf. Armienti v. United States*, 313 F.3d 807, 815 (2d Cir. 2002) (holding that, even though counsel did not discuss the option of a plea agreement, conflict of interest claim premised on counsel's failure to pursue a plea agreement failed where defendant adamantly refused to cooperate with the government).

**[7]** Moreover, and critically, there simply is no indication in the record, either in the original trial or in the habeas pro-

ceedings here, that Wells had any information concerning Jones' activities that could have been helpful in convicting him. Nor is there evidence in the record that the government was interested in obtaining information from Wells about Jones. There is also nothing in the record that indicates Jones' defense, which later resulted in his acquittal, was not true, that Wells had any information that it was not, or that his lawyer had any reason to believe that Wells had such information. *Cf. Belmontes v. Woodford*, 350 F.3d 861, 886 (9th Cir. 2003) (holding that speculative alleged failings by counsel are insufficient to support a conflict of interest claim). Absent any showing to the contrary, we cannot conclude there was an actual conflict of interest adversely affecting Abraham's representation of Wells, even after the jury's verdict.

## III

In summary, this simply is not a case in which counsel (Abraham) took, or refrained from taking, favorable action on behalf of one client (Jones) to the detriment of another client (Wells). *Cf. Shwayder*, 312 F.3d at 1118-20 (in successive representation case where the defendant had an interest in laying blame on coconspirator who cooperated with the government and testified at defendant's trial, court found no adverse effect on counsel's performance because counsel was not ethically restricted from vigorously cross-examining coconspirator and counsel had actually impugned coconspirator's credibility several times throughout the trial); *see also Lewis v. Mayle*, No. 03-16152, 2004 WL 2699900, at *7-9 (9th Cir. November 29, 2004) (in a successive representation case where the state's primary witness and only eyewitness to the murder allegedly committed by the petitioner, court found that an adverse effect was demonstrated because counsel failed to pursue three viable avenues of impeachment of the state's primary witness); *McFarland v. Yukins*, 356 F.3d 688, 709-10 (6th Cir. 2004) (holding that counsel labored under actual conflict of interest in violation of Sixth Amendment in jointly representing defendant and codefendant charged with

possessing same drugs in their jointly occupied apartment, where counsel forewent obvious and strong defense of inculpating codefendant as possessor of drugs and instead implausibly argued that third parties possessed drugs); *Quintero v. United States*, 33 F.3d 1133, 1136-37 (9th Cir. 1994) (holding that evidentiary hearing warranted on conflict of interest claim where counsel's advice to defendant to reject plea agreement was not in defendant's best interest and, thus, advice to reject plea agreement could have been motivated by a desire to keep the defendant from implicating the person paying the defendant's attorney's fees). Nor is this a case where a drug courier or low-level drug dealer is at the mercy of a drug kingpin or unknown third party. *Quintero*, 33 F.3d 1136-37. As noted above, there is no evidence that the fee arrangement affected Abraham's handling of any issue in the case. In fact, the record reflects that Abraham's performance was unaffected by the fee arrangement and he, as the district court found, put on a spirited defense in his representation of Wells, a defense, which in all principal respects mirrored Jones' defense. *Cf. Berry v. United States*, 293 F.3d 501, 505 (8th Cir. 2002) (holding that, although counsel had an actual conflict at sentencing, no adverse effect shown where counsel's advice at sentencing "was more than reasonable, and evidently unaffected by any ulterior consideration").[5]

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

B. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent. Robert Wells was denied effective

---

[5]Because Wells' conflict of interest claim fails on the merits, we need not address the district court's alternative holding that Wells waived any conflict of interest.

assistance of counsel in two respects. His defense attorney, Joseph Abraham, labored under an actual conflict of interest. Abraham's legal fees were paid by Daniel Jones, one of Wells's indicted co-conspirators,[1] and the record establishes that this fee arrangement adversely affected Abraham's representation. Second, Abraham was absolutely unwilling to negotiate with the government on behalf of Wells even though it could have materially decreased Wells' sentence.

## I.

"A criminal defendant's Sixth Amendment right to counsel includes the right to be represented by an attorney with undivided loyalty." *Lockhart v. Terhune*, 250 F.3d 1223, 1226 (9th Cir. 2001). Unlike other Sixth Amendment claims, a claim that a lawyer operated under an actual conflict of interest does not require the petitioner to prove that his counsel's deficient performance prejudiced his defense. *Id.* (quoting *Delgado v. Lewis*, 223 F.3d 976, 981 (9th Cir. 2000)); *see also United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003). It is enough to prove the existence of an actual conflict—a conflict that "affected counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).

## II.

Wells meets his burden with evidence that the potential conflict created by Abraham's fee arrangement actually affected Abraham's representation in two ways. First, Abraham asked Wells to sign a declaration that helped Jones, but that could have prejudiced Wells's own defense. Second, Abraham flatly refused to negotiate with the government on Wells's behalf—a refusal that could only have benefitted Jones.

---

[1] The majority suggests that although Jones advanced the money, the money actually might have been Wells's. What is critical, however, is that Abraham *thought* its source was Jones.

A.

On July 8, 1991, shortly after the criminal trial in this case had begun, Abraham presented Wells with a prepared declaration that Abraham intended to file in support of Jones's motion to sever his trial from that of his co-defendants. Wells signed the declaration, apparently after a brief discussion with Abraham. The declaration stated that Wells had decided not to testify at his own trial, but that if Jones were given a separate trial, Wells would testify at that trial that in March 1985 Jones withdrew "from all activity involving the allegations in the Indictment" and "abandoned all economic and financial interest in our ventures."

There is no evidence in the record that Abraham ever discussed with Wells the potentially inculpatory nature of this declaration. For example, if one assumes, as co-conspirator Don Wogamon testified at trial, that Wells and Jones conspired to manufacture and distribute methamphetamine from 1983 through the early part of 1985, then Wells's declaration immediately takes on an incriminating cast. It admits Wells's participation in what Wogamon described, in detail, as an illicit, business venture centered around the manufacture and distribution of methamphetamine. Contrary to the majority, the language that Wells, if called to testify in a separate trial of Jones would testify that Mr. Jones "manifested a clear intention to withdraw from all activity involving the allegations in the Indictment in this case" is incriminating. It does not limit the "activity" to the gold mine operation as the majority suggests.

At the evidentiary hearing on Wells's § 2255 motion, Wells's habeas counsel asked Abraham to explain what possible benefit could have accrued to Wells as a result of the July 8, 1991 declaration. Abraham could not point to any benefit. Instead, he explained that he presented the declaration to Wells because it provided support for the severance motion of

Wells's friend Jones—the co-conspirator and co-defendant, who Abraham thought was paying his legal fees.

## B.

Abraham and Wells first met in 1991, after Wells had been arrested on the charges at issue in this case. At their first meeting, Abraham made it clear that his offer of representation was limited. When Wells asked about his "option[s]" other than trial, Abraham said: "[I] don't represent snitches."

A policy like Abraham's raises serious ethical questions. *See United States v. Lopez*, 4 F.3d 1455, 1464-66 (9th Cir. 1993) (B. Fletcher, J., joined by T.G. Nelson, J., concurring); *see also* ABA Model Rule of Professional Conduct 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation . . . . In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify."); *id.* at 1.2(c) ("A lawyer may limit the scope of the representation *if the limitation is reasonable* under the circumstances *and the client gives informed consent*.") (emphasis added). The plea bargaining process is so important in our criminal justice system that a defense lawyer who refuses to negotiate with the government will often fail to provide the effective assistance required by the Sixth Amendment. *See Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002) (explaining that negotiations with the government are a "critical stage" of a prosecution for Sixth Amendment purposes). The type of truncated representation offered by Abraham certainly falls far short of the ideal attorney-client relationship expounded in *Strickland*. *See Lopez*, 4 F.3d at 1464 ("[T]he model of a successful attorney-client relationship, as expounded in *Strickland v. Washington*, is one in which counsel's actions are based on informed strategic choices made by the defendant and on information supplied by the defendant.") (internal quotation marks and alterations omitted).

Notwithstanding these ethical problems with Abraham's approach, Abraham stuck to his policy throughout Wells's trial, even after the jury convicted Wells but was unable to reach a verdict as to Jones on several counts. The majority suggests that Abraham may have decided not to pursue negotiations with the government because Wells had no useful information to give—not because Abraham was affected by a conflict of interest.[2] This view of the record is flawed in two respects.

First, the majority's view assumes that Jones had a valid statute of limitations defense, and that Wells could not have implicated Jones in any illegal acts within the limitations period. However, Jones was charged in at least one count for which Wells could have provided critical testimony and for which Jones did not have an obvious statute of limitations defense. The "Butte indictment" charged Jones with manufacturing and distributing methamphetamine on March 11, 1985. Because that indictment was filed on February 23, 1990, the charged violation fell within the five-year limitations period.

Second, Abraham testified at the evidentiary hearing on Wells's § 2255 motion that he and Wells never discussed whether Wells could provide assistance to the government. It is difficult to imagine that a defense attorney unaffected by a conflict of interest would not at least have asked Wells if he could provide information useful to the government, particularly when Wells had already been convicted and Jones faced a second trial on the hung-jury counts. Compelling trial testimony established that Jones and Wells had manufactured methamphetamine together for several years in the early 1980s. Even if Wells could not have provided the government with information about Jones's involvement in the March 11,

---

[2]Similarly, the majority implies that the government had no interest in obtaining information from Wells about Jones. I find this specious — Jones' first jury was hung. His second acquitted. The government needed help and Wells was the obvious source.

1985 distribution, or about Jones's involvement in criminal acts within five years of the "Helena indictment," Wells clearly had a wealth of incriminating background information about Jones that he could have provided to the government. Yet Abraham failed to broach the subject of cooperation with the government. This unexplained failure could have benefitted only Jones.[3]

The most logical explanation for Abraham's conduct is that his representation of Wells was adversely affected by a conflict of interest. This is the only explanation, in fact, that accords with Jones's conduct. Jones agreed to pay for Wells's criminal defense even though Jones and Wells had had a falling out in 1985 and had not spoken before the 1991 trial. It strains credulity to assume that Jones volunteered to pay Abraham's significant legal fees[4] without at least expecting loyalty in return.

### III.

The July 8, 1991 declaration and Abraham's refusal to negotiate with the government, viewed in light of Jones's unexplained willingness to pay for Wells's defense, lead me to conclude that Abraham's representation was adversely affected by an actual conflict of interest. I would grant the writ.

---

[3]Abraham suggested at the evidentiary hearing on Wells's § 2255 motion that he simply preferred trials to plea negotiations: "Whenever I get ready to be involved in a case, I candidly tell the person that I'm about to be involved with that if he wants to be a government witness he doesn't need me to represent him." Even if true, this preference does not explain Abraham's failure to raise the issue of government cooperation after Wells was convicted. At that point, Abraham had already had his chance to take the case to trial. Abraham had nothing to lose and Wells had everything to gain.

[4]Wells testified that Abraham was paid $100,000 for his trial representation and $30,000 for his appellate work. Abraham testified that he probably received $60,000 for the trial and $25,000 for his appellate work. At a minimum Jones paid $85,000 for Wells's criminal defense.