# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SALUSSOLIA, ALDYKIEWICZ, and EWING
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Staff Sergeant THERON R. WILLIAMS**
**United States Army, Appellant**

ARMY 20160231

Headquarters, United States Army Alaska
Kenneth W. Shahan, Scott A. Oravec, and Michael J. Hargis, Military Judges
J. Harper Cook, Military Judge (DuBay)
Colonel Erik L. Christiansen, Staff Judge Advocate


For Appellant:  Lieutenant Colonel Tiffany D. Pond, JA; Lieutenant Colonel Todd W. Simpson, JA; Major Heather M. Martin, JA (on brief).

For Appellee:  Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Hannah E. Kaufman, JA; Major Jonathan S. Reiner, JA (on brief).


3 July 2019

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

SALUSSOLIA, Judge:

In this appeal we consider, but reject, appellant's claim that his defense counsel were ineffective based on an actual conflict of interest.  Nonetheless, we set aside the findings of guilty as to appellant's conviction of rape in light of our superior court's decisions in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), and *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017).

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of rape, one specification of larceny, and one specification of assault consummated by battery in violation of Articles 120,

121, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 921, and 928 (2012)[UCMJ].[1]  The military judge sentenced appellant to a dishonorable discharge, confinement for six years, and reduction to the grade of E-1.  The convening authority approved the findings and sentence as adjudged.

This case is before us for review under Article 66, UCMJ.  Appellant assigns four errors.  We will first discuss appellant's claim that he received ineffective assistance of counsel.  Second, we will discuss the military judge's use of one charged sexual offense as propensity to prove another charged sexual offense in appellant's case.[2]  We have also considered the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), one of which merits brief discussion, but none warrant relief.

## BACKGROUND

*Appellant's Offenses*

Appellant's convictions stem from three separate incidents, two of which involve his wife, LW.  Appellant and LW married in 2007 at Fort Drum.  In 2015, while stationed at Fort Wainwright, Alaska, LW suspected appellant was unfaithful in the marriage.  She confronted appellant about her suspicions, which led to an argument during which appellant grabbed LW's neck with both of his hands.  When appellant let go of her neck, LW ran to a neighbor's house and told the neighbor to call the police because appellant "tried to choke her."  Thereafter, LW reported to the police that appellant raped her while they were stationed at Fort Drum in 2007, attempted to rape her in 2014, and raped her in 2014 while they were stationed at Fort Wainwright.  Appellant was interviewed by CID, waived his rights, and made several admissions pertaining to the sexual offenses.

---

[1] The military judge found appellant not guilty, in accordance with his pleas, of one specification of attempted rape, one specification of rape, and one specification of assault of a child under the age of sixteen, in violation of Articles 80, 120 and 128, UCMJ, 10 U.S.C. §§ 880, 920, and 928 (2012).

[2]  Appellant's other two assigned errors not warranting relief are: (1) dilatory post-trial processing where the government took 420 days to process the record of trial from sentencing to action, and; (2) the military judge erred by admitting hearsay obtained by a multi-disciplinary team led by law enforcement as medical hearsay.  Regarding the admission of the medical hearsay, even assuming the military judge erred, we find no prejudice to appellant.  *See* UCMJ art. 59(a).  The government presented corroborating evidence that appellant assaulted LW, other than LW's statement to the multi-disciplinary team and her trial testimony, that convinces this court beyond a reasonable doubt of appellant's guilt.

After a three-day trial, conducted 4-6 April 2016, appellant was convicted of raping LW in 2014, assaulting her in 2015, and stealing an Army Service Uniform jacket from the Army and Air Force Exchange Service.

## LAW AND DSICUSSION

### A. Ineffective assistance of counsel

Our discussion of appellant's claim of ineffective assistance first requires a detailed history of circumstances surrounding Captain (CPT) JB's, appellant's trial defense counsel, permanent change of station (PCS) following his assignment as a trial defense counsel.

### 1. CPT JB's ethics investigation.

Assigned to the Army Trial Defense Service (TDS), CPT JB was one of the defense counsel detailed to defend appellant at his court-martial.[3] After the charges against appellant were preferred, the Chief of the Army Trial Defense Service (TDS) appointed an officer to conduct an inquiry into allegations that CPT JB committed professional misconduct.[4]

Almost a month before appellant's trial, CPT JB was notified by his Regional Defense Counsel (RDC) that the Chief of TDS approved the investigating officer's determination that there was insufficient credible evidence to support the allegations against him. The investigation was eventually forwarded to the Army Judge Advocate General Corps' [JAG Corps] Professional Responsibility Branch which concurred with the approved findings.[5]

---

[3] Captain JB served as lead defense counsel and CPT BD served as the assistant trial defense counsel in appellant's case.

[4] *See* Army Reg. 27-1, Legal Services: Judge Advocate Legal Services, para. 7-4 (30 Sep. 1996) (procedure for investigating suspected professional misconduct of judge advocates). Captain JB was alleged to have violated the Army Rules of Professional Conduct for Lawyers "Fairness to Opposing Party and Counsel," stemming from his purported actions while representing a client in a case unrelated to appellant's court-martial. *See* Army Reg. 27-26, Legal Services: Rules of Professional Conduct for Lawyers [AR 27-26], Rule 3.4 (1 May 1992). The investigation into CPT JB was initiated on 16 November 2015.

[5] The Army JAG Corps' Professional Responsibility Branch completed its review of the investigation on 26 April 2016.

### 2. *CPT JB's reassignment event*

Captain JB was scheduled to leave TDS to a new assignment by the summer of 2016. In December 2015, CPT JB's supervising RDC submitted a recommendation to the Personnel, Plans and Training Office (PPTO) assignment officer requesting that CPT JB be assigned as the senior Special Victim Counsel (SVC) at I Corp, located at Joint Base Lewis-McChord (JBLM), Washington. The PPTO assignment officer tentatively approved the placement of CPT JB into this position by "penciling" him in. By January 2016, the RDC relayed this information to CPT JB who was satisfied with the senior SVC assignment as it met his desires regarding a leadership position and preferred location.

In February of 2016, actions occurred that changed the status of CPT JB's follow-on assignment to JBLM. This change in assignment status was set in motion by a conversation between the U.S. Army Alaska (USARAK) SJA and the I Corps SJA. During a phone discussion involving routine professional matters, the USARAK SJA mentioned CPT JB's pending assignment as the senior SVC to JBLM and stated that "[CPT JB] would need supervision." This statement was seemingly based on the pending investigation into CPT JB's alleged professional misconduct described above. Soon after this conversation, the I Corps SJA mentioned CPT JB's name to his Deputy SJA and another staff officer within the OSJA who then informed him that CPT JB was the subject of an Army Reg. 15-6 substantiated investigation for misconduct of a sexual nature while serving in a non-defense counsel assignment in Honduras.[6]

The I Corps Deputy SJA notified the PPTO assignment officer of concerns with CPT JB's fitness to serve as an SVC in light of his prior misconduct in Honduras and the ongoing investigation into his suspected professional misconduct as a defense counsel. Determining that CPT JB would not be able to certify as an SVC, the PPTO assignment officer informed the RDC of the situation.[7] When the RDC informed CPT JB that he would not be going to I Corp as the senior SVC and that the USARAK SJA prompted this change in status, CPT JB was initially angry and upset.

---

[6] *See* Army Reg. 15-6, Boards, Commissions, and Committees: Procedures for Administrative Investigations and Boards of Officers (2 Oct. 2006).

[7] *See* Special Victims' Counsel Handbook, Third Edition, Chapter 10(d)(5) (April 2016) (requiring SVC's to sign a self-certification memorandum stating, "I do not have any substantiated pending or resolved administrative actions against me of any kind to include sexual assault, sexual battery, sexual harassment or any other such sexual or domestic violence related charge(s) or offenses.").

Soon after, the RDC and the PPTO assignment officer discussed other possible assignment options for CPT JB. After consulting with his RDC, CPT JB identified three new positons in which he was interested. Prior to appellant's trial, CPT JB was made aware that he would receive one of his requested positions, the Chief of Justice position at Fort Knox, Kentucky. Captain JB was pleased with the new assignment as it fulfilled his primary desire to be placed in a leadership position.[8]

### 3. *United States v. Nelson*

The first mention of CPT JB's reassignment event impacting his performance as a defense counsel occurred two weeks after appellant's court-martial, in another case, *United States v. Nelson*, in which CPT JB was a detailed defense counsel. Captain JB's co-counsel, CPT AM, filed a motion in the *Nelson* case alleging unlawful command influence (UCI) based on the above reassignment event which was purportedly precipitated by the USARAK SJA's statements to the I Corps SJA about CPT JB. The motion argued CPT JB could not adequately represent his clients because he feared professional retribution by the USARAK SJA. Captain JB testified at the hearing on the UCI motion and indicated that he had withheld advice or changed his trial strategy in at least one other case. After the hearing, the trial counsel approached CPT JB and asked him if there was anything CPT JB would have done differently in appellant's trial. Captain JB replied, "I don't know." Although denying the UCI motion, the military judge in *Nelson* raised the question of whether CPT JB may have a conflict of interest arising from the USARAK SJA's actions.

### 4. *United States v. Ducksworth*

Captain JB's reassignment resurfaced in another of his client's trials, *United States v. Ducksworth*. In *Ducksworth*, the military judge raised CPT JB's possible conflict of interest that was litigated in the *Nelson* UCI motion during a Rule for Courts-Martial [R.C.M.] 802 session. The military judge in *Ducksworth* found CPT JB had a non-waiveable conflict and disqualified him from serving as defense counsel in that case.

### 5. *Post-trial Article 39(a) sessions*

Based on the UCI motion in *Nelson*, CPT JB's disqualification in *Ducksworth*, and his statement to the trial counsel that he may have withheld advice or changed trial strategy in appellant's trial, the government requested a post-trial Article 39(a) session in appellant's case pursuant to R.C.M. 1102(b)(2) to address whether any

---

[8] Captain JB received Permancent Change of Station (PCS) orders to Fort Knox on 25 March 2016.

remedial action was necessary to preserve the findings and sentence. In response to the government's request for a post-trial Article 39(a) hearing, appellant, now represented by new counsel, filed a motion for a mistrial asserting numerous deficiencies with CPT JB's performance, claiming these deficiencies resulted from him laboring under a conflict of interest.

There were two post-trial Article 39(a) sessions in appellant's case. At the first session, CPT JB testified, but was unable to respond thoroughly to questions without his notes from appellant's case, which were packed with his household goods. Once CPT JB received his case file, he testified in a second post-trial Article 39(a) session, but as we will describe, CPT JB did not testify with more specificity. Essentially, CPT JB testified at the post-trial 39(a) sessions that he usually tried cases "unconventionally," and that in appellant's case he was "straight laced" and "acted differently" because he was under the proverbial microscope. In his testimony, CPT JB agreed with the characterization that he "pulled punches" in appellant's case. However, when directly asked by the military judge what "punches" he may have pulled, or how he acted differently (i.e., what he did not do in appellant's case, but perhaps should have), CPT JB offered shilly-shallying responses citing no specific instances of less than competent and zealous representation.

At the conclusion of the post-trial Article 39(a) hearings, the military judge denied appellant's motion for a mistrial. In his ruling, the military judge did not address whether CPT JB operated under an actual conflict of interest because the military judge instead found that none of CPT JB's alleged performance deficiencies had actually prejudiced appellant.

### 6. *DuBay Hearing*

As one of appellant's assignments of error, he frames a claim of ineffective assistance of counsel based on the assertion that his trial defense counsel, CPT JB, labored under an actual conflict of interest and the conflict adversely affected his representation of appellant. Appellant claims the conflict arose from the USARAK SJA allegedly interfering with CPT JB's follow-on assignment. According to appellant this interference caused CPT JB to become more concerned with his own career and consequently limited his zealous representation of appellant.

Based on our initial review of the record of trial, and the parties' pleadings we found inconsistencies with CPT JB's post-trial testimony.[9] On 6 November 2018, we ordered a fact-finding hearing pursuant to *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967) [*DuBay* hearing]. The essential question for the military

---

[9] This court heard oral argument on the issue of whether CPT JB represented appellant under an actual conflict of interest on 18 October 2018.

judge to answer was whether CPT JB represented appellant while laboring under an actual conflict of interest.

On 28 February and 1 March 2019, the detailed military judge (*DuBay* judge) conducted the *DuBay* hearing and issued extensive findings of fact and conclusions of law. After considering the evidence adduced at the hearing, the *DuBay* judge concluded that CPT JB was not laboring under an actual conflict of interest and in the alternative, assuming arguendo that he had such a conflict, it did not adversely affect his performance regarding appellant's case. The parties filed post-*DuBay* supplemental pleadings on this issue, and the case is once again before us.

The Sixth Amendment right to effective assistance of counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "A conflict of interest is actual, as opposed to potential, when during the course of representation, the attorney's and defense's interest diverge with respect to a material factual or legal issue or a course of action." *United States v. Hale*, 76 M.J. 713, 723 (N.M. Ct. Crim. App. 2017) (citation and internal quotation omitted). "Allegations of conflicts of interest during ineffective assistance of counsel inquiries are reviewed de novo." *United States v. Calhoun*, 49 M.J. 485, 489 (C.A.A.F. 1998). To establish an actual conflict of interest, appellant must show: (1) counsel actively represented conflicting interests; and (2) the actual conflict of interest adversely affected his lawyer's performance.[10] *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

To show an adverse effect, appellant must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (citation and internal quotation omitted). "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest." *Strickland v. Washington*, 466 U.S. 668, 692 (citing *Cuyler*, 446 U.S. at 345-50).

---

[10] The Army's ethical rules regulate a lawyer's responsibility in this regard as well. The Army Rules of Professional Conduct for Lawyers state, "A lawyer shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation." AR 27-26, Rule 1.7(b) (1 May 1992). "A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." AR 27-26, comment to Rule 1.7.

A *DuBay* judge's factual findings are reviewed under a clearly erroneous standard. *United States v. Clark*, 55 M.J. 555, 560 (Army Ct. Crim. App. 2001). Reviewing the *DuBay* judge's essential findings of fact in this case under a clearly erroneous standard, we conclude that they are supported by the record. Although we have an independent duty to determine the question of an actual conflict of interest de novo, we also concur with the *DuBay* judge's conclusion and underlying reasoning that CPT JB did not labor under an actual conflict of interest when he represented appellant.

### 7. *No actual conflict from ethics investigation*

We first agree with the *DuBay* judge that the ethics investigation initiated against CPT JB did not give rise to an actual conflict of interest because it did not cause CPT JB to place his own self-interest above that of appellant. Rather, the record before us establishes that from initiation of the ethics investigation to its conclusion, CPT JB believed the allegations lodged against him to be entirely meritless. Further, his belief was confirmed by the investigating officer's determination a month prior to appellant's trial, when CPT JB was informed by his RDC that the allegations against him were unsubstantiated. Lastly, CPT JB consistently and credibly echoed in his testimony that the ethics investigation did not have a negative effect on his representation of appellant.

### 8. *No actual conflict from reassignment*

We also agree with the *DuBay* judge that CPT JB did not actively represent conflicting interests due to actions by the USARAK SJA. In other words, we are convinced that, at the time of appellant's court-martial, CPT JB did not harbor a genuine belief that he had to place his personal interest in protecting his professional reputation, based on either a fear the USARAK SJA would interfere with his career or by a desire to repair his professional reputation with the USARAK SJA, above his duty to competently and zealously represent appellant. As we detail below, we are convinced CPT JB had no conflict stemming from his reassignment based on his representations and actions before, during, and after appellant's court-martial.

First, while we recognize CPT JB was initially upset and angry at what he believed was the USARAK SJA having an impermissible hand in the loss of his follow-on assignment as senior SVC, we are convinced that these emotions all but subsided prior to appellant's trial. By the time of appellant's trial, CPT JB had received his follow-on assignment to be the Chief of Justice at Fort Knox (an assignment of at least equal value) due to the efforts of his TDS leadership. Additionally, we find nothing in the record to convince us that CPT JB possessed a genuine belief that the USARAK SJA would take some future action to negatively impact his next assignment or career.

8

Second, to the extent CPT JB still harbored negative emotions toward the USARAK SJA, we believe this fueled a desire to advocate more zealously on behalf of his client, as demonstrated by his participation in the UCI motion. Captain JB certainly did not try to placate the USARAK SJA. This does not mean we give credence to appellant's new post-*DuBay* assertion that CPT JB had an actual conflict of interest because he possessed a greater desire to retaliate against the USARAK SJA than represent appellant's interests. We reject this assertion as mere speculation and find nothing in the record to conclude CPT JB's animosity toward the USARAK SJA came at the expense of his duty to appellant. In fact, any desire by CPT JB to "stick it" to the USARAK SJA appears to be in concert with CPT JB's zealous represention of appellant.

Third, we also discern the lack of an actual conflict of interest based on CPT JB's assurances to his immediate supervisor prior to appellant's court-martial that he could effectively represent all clients, to include appellant, despite any concerns to include his perceived reassignment interference by the USARAK SJA. Captain JB never retracted his assurance that he would give one hundred percent to his clients prior to or at the time of appellant's trial. Captain JB also did not express or indicate to his co-counsel in appellant's case that the he was somehow concerned with his ability to competently and zealously represent appellant. We are not persuaded by CPT JB's post-trial testimony purporting a division of loyalties based on the actions of the USARAK SJA or his alluding to the fact that he was operating less robustly due to divided loyalties. We find these statements lacking in credibility based on the vagueness and evasiveness of CPT JB's responses when pressed for details on these and similar statements by both the post-trial Article 39(a) military judge and the *DuBay* military judge.

Fourth, our review of the record reflects that CPT JB's actions belie the fact that he was encumbered by an actual conflict of interest. As already noted, CPT JB did not shy away but rather actively supported the filing of the UCI motion in *United States v. Nelson*. This demonstrates CPT JB neither feared the USARAK SJA nor sought to cajole him in an effort to repair a strained relationship.

Appellant's brief lists several actions CPT JB did not take as evidence of actual conflict. These claimed deficiencies can be summarized as CPT JB conducting an inadequate cross-examination of LW, not pursuing certain avenues of impeachment of LW, and failure to request an expert in false confessions. We need not discuss whether any of these actions constitute deficient performance because there is no evidence in the record to support a finding that CPT JB did not undertake these actions due to his personal interest in protecting his personal reputation. In fact, the record supports the opposite in regards to the false confession expert. Captain JB testified at the second post-trial Article 39(a) hearing that he did not request an expert in false confessions because appellant told him his admissions to

9

CID were true (although taken out of context), which CPT JB felt did not "trigger" a false confession.[11]

Additionally, CPT JB effectively led the defense team in appellant's fully contested trial, which due to significant efforts on CPT JB's part resulted in appellant being acquitted of two of the more serious offenses against him, the one specification of attempted rape and the other specification of rape alleged to have occurred at Fort Drum. These favorable results were obtained notwithstanding damaging statements made by appellant to CID. Captain JB also proficiently argued significant motions and took full advantage of the government's struggles throughout the trial.[12] Accordingly, we are convinced that CPT JB performed competently and zealously in his representation of appellant.

---

[11] In appellant's matters submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), he claims he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), for essentially the same reasons he claims his defense counsel had an actual conflict of interest. Under *Strickland*, appellant must demonstrate both (1) his counsel's performance was deficient, and (2) this deficiency resulted in prejudice. *Id*. at 687. In regards to the second prong, appellant must show that *but for* the claimed deficiencies, "the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. We find appellant has not demonstrated there is a reasonable probability that if CPT JB had cross-examined LW differently, pursued certain avenues of impeachment of LW, or requested a false confession expert, the factfinder would have harbored a reasonable doubt respecting guilt. *See id*. at 697 (court need not determine whether counsel's performance was deficient before examining the prejudice suffered by appellant).

[12] For example, CPT JB opposed the government's motion to introduce charged offenses as propensity evidence under Mil. R. Evid. 413. This motion was submitted on 28 March 2016 and argued on 5 April 2016, prior to our superior court's ruling in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), on 27 June 2016, and approximately a year prior to its decision in *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017). Captain JB's objection preserved this issue on appeal for which we grant relief below.

We further note CPT JB made several other well thought-out objections during appellant's court-martial that demonstrate he was making no effort to curry favor with the USARAK SJA. For example, CPT JB opposed the government's pre-trial motion to amend the charged timeframe in Charge II and its specification (of which appellant was acquitted), from "between on or about 4 July 2008 and 31 August 2008" to "between on or about 5 November 2007 and 31 August 2008." Captain JB

(continued . . .)

### B. Charged offenses as propensity evidence

We next turn to appellant's other assignment of error meriting discussion and relief, that the military judge erred by considering charged misconduct as propensity evidence and that his use of propensity evidence was not harmless beyond a reasonable doubt. The government filed a pretrial motion under Mil. R. Evid. 413 requesting the charged sexual offenses be used as propensity evidence to prove other charged offenses. Appellant's defense counsel opposed the government's motion arguing that Mil. R. Evid. 413 did not apply to charged misconduct. The military judge deferred his ruling until the close of evidence.

After the close of evidence, the military judge ruled in favor of the government holding that the charged attempted rape (Charge I and its specification) could be used as propensity evidence for the rape occurring in December 2014 (Charge III and its specification). In arriving at his ruling, the military judge found the propensity evidence relevant and probative. Additionally, the military judge determined that this propensity evidence was not substantially outweighed by a danger of unfair prejudice under Mil. R. Evid. 403 stating, "there was little physical evidence regarding these offenses and so there is not an estimate of other less prejudicial evidence available to the fact finder."

The government acknowledges the military judge erred, but asserts his use of propensity evidence was harmless beyond a reasonable doubt due to the overwhelming nature of the evidence against appellant. For the reasons stated below, we are not convinced that there was no possibility the Mil R. Evid. 413 evidence contributed to appellant's conviction. Accordingly, we provide relief in our decretal paragraph.

In *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), our superior court held it is impermissible to use evidence of charged offenses as Mil. R. Evid. 413 propensity evidence against an accused for other charged offenses. The following year, our superior court clarified that regardless of forum, "the use of evidence of charged conduct as [Mil. R. Evid. 413] propensity evidence for other charged conduct in the same case is error." *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017). Likewise, having found error of constitutional implications, each erroneous admittance of evidence must be tested for prejudice under the harmless beyond a

---

(. . . continued)
opposed the motion arguing this was an impermissible major change post-referral under R.C.M. 603. Another example of CPT JB's zealous representation of appellant is his objection to the government's expert witness testifying due to the government's failure to provide notice under R.C.M. 703(d). Captain JB's objections were aimed at destroying the prosecution's case against appellant and are certainly not consistent with him "pulling punches."

reasonable doubt standard. *Hukill*, 76 M.J. at 222; *see also United States v. Tovarchavez*, 2019 CAAF LEXIS 394 (C.A.A.F. 31 May 2019) (standard of review for constitutional error is whether the error was harmless beyond a reasonable doubt). Improper consideration of propensity evidence is harmless when the government's evidence is overwhelming, thus allowing us to "rest assured that an erroneous propensity instruction did not contribute to the verdict by 'tipp[ing] the balance in the [factfinder's] ultimate determination.'" *United States vs. Guardado*, 77 M.J. 90, 94 (C.A.A.F. 2007) (quoting *Hills*, 75 M.J. at 358). An error is not harmless beyond a reasonable doubt when there is a reasonable possibility the error complained of might have contributed to the conviction. *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007); *United States v. Chandler*, 74 M.J. 674, 685 (Army Ct. Crim. App. 2015).

Here, we are not convinced beyond a reasonable doubt that propensity evidence (i.e., the attempted rape offense set forth in Charge I and its specification) did not contribute to the findings of guilty as to Charge III and its specification (rape of LW at Fort Wainwright in 2014). First, the military judge explicity stated in his ruling on the record "if the court has found by a preponderance of the evidence, that Charge I occurred, then it may be used as *propensity evidence* for proving Charge III." (emphasis added). The military judge then convicted appellant of Charge III and its specification.

While we could stop there, we also note the government's case was not substantially overwhelming regarding the charged rape for which appellant was convicted. First, the government's evidence of the Charge III and its specification relied primarily on the testimony of LW, with no corroboration of her testimony. As the military judge noted in his Mil. R. Evid. 413 ruling, "there was little physical evidence [of the sexual assaults]." While appellant made some statements indicating guilt of a sexual assault based on LW's non-consent, his statements do not admit to the commission of the offense of rape, which requires proof of force. Accordingly, the findings of guilty as to Charge III and its specification and the sentence cannot stand.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty of Charge III and its specification are SET ASIDE. The remaining findings of guilty are AFFIRMED. The sentence is SET ASIDE. The same or a different convening authority may: 1) order a rehearing on Charge III and its specification and the sentence; 2) dismiss Charge III and its specification and order a rehearing on the sentence only; or 3) dismiss Charge III and its specification and reassess the sentence, affirming no more than a bad-conduct discharge, confinement for six

12

months, total forfeiture of all pay and allowances, and reduction to the grade of E-1.[13]

Judge ALDYKIEWICZ and Judge EWING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[13] In reassessing the sentence, we are satisfied the sentence adjudged on the offenses we affirm would have been at least a bad-conduct discharge, confinement for six months, total forfeiture of all pay and allowances, and reduction to the grade of E-1. *See United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986); *United States v. Wincklemann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013). This reassessment, being both appropriate and purging the record as it stands of error, does not otherwise limit the sentence that may be adjudged at a rehearing. *See* UCMJ, art. 63.